Argued July 11, accused reprimanded September 26, petition for rehearing denied October 24, 1978

In re Complaint as to the Conduct of
**CHARLES O. PORTER,** *Accused.*
(OSB 1248, SC 25631)

584 P2d 744

John E. Jaqua, Eugene, argued the cause for the accused. With him on the briefs were Jack L. Mattison and Jaqua & Wheatley, P.C., Eugene.

Frederick L. Decker, of Goode, Goode, Decker, Beckham & Nelson, P.C., Albany, argued the cause for the Oregon State Bar. With him on the brief was Robert S. Gardner, of Ringo, Walton, Eves & Gardner, P.C., Corvallis.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson and Lent, Justices.

PER CURIAM.

**PER CURIAM.**

This is a disciplinary proceeding by the Oregon State Bar charging the accused with four counts of unethical conduct. The charges arose from the representation by the accused of 14 women, some of whom were present at or participants in an incident in which a Lane County sheriff's deputy was killed.

The specific charges were: (1) conflict of interest arising out of the representation of multiple clients; (2) improper communication with a person represented by counsel; (3) improper interference with plea negotiations; and (4) the acts alleged in the first three charges, taken in the aggregate, were "detrimental and prejudicial to the honor, integrity and standing of [the] profession of lawyer, the practice of law and the administration of justice * * *."

The Trial Board of the Bar, after a hearing at which testimony was offered, found that the accused was not guilty of charges (1), (2) and (3), but was guilty of charge (4). The Trial Board recommended that the accused be administered a public reprimand. The Disciplinary Review Board of the Bar concluded that the accused was not guilty of any of the four allegations of misconduct, and recommended that the charges be dismissed. The case now comes before this court on the petition of the accused to adopt the decision of the Disciplinary Review Board.

The principal charge against the accused is that in undertaking to represent all 14 women he had a conflict of interest, in violation of Disciplinary Rule 5-105 which provides:

"Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.
"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be

[ 519 ]

adversely affected by the acceptance of the proferred employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"* * * * *."

The facts giving rise to the conflict of interest charge are summarized by the Disciplinary Review Board as follows:

"This case arose out of a criminal prosecution resulting from the killing of a Lane County Deputy Sheriff. The Sheriff was apparently killed by Belinda Leigh Lederer, who at the time was a member of a 'family' (Children of The Valley of Life). The 'family' consisted of a male and several female members. The male family member, one Brooks, was indicted and acquitted of the homicide of the Lane County Deputy. Belinda Leigh Lederer was indicted and was represented by Jack A. Gardner and F. William Honsowetz, members of the Oregon State Bar.

"Several other female members of the 'family' were found to be material witnesses and some of them were possible Defendants in other criminal charges arising out of the homicide—e.g. moving the body, theft of property, illegal use of a police car, etc.

"The Accused at first represented all the females in the 'family' and Mr. Brooks.[1] He resigned as counsel for Brooks and later, after discussing possible conflicts in representing the other female 'family' members with Judge Rodman, he resigned that representation as well. Other lawyers were appointed, and after Brooks was acquitted all female members of the 'family' wanted to retain the Accused as their lawyer. A hearing was held before Judge Helen Frye. Judge Frye relieved court

---

[1]In fact, the accused never represented Belinda Lederer, one of the female members of the "family."

appointed counsel for approximately 14 of the female members, and the Accused commenced representing them. One or two female 'family' members [in addition to Belinda Lederer] continued to be represented by court appointed counsel. The Accused was not court appointed.

"The 'family' was close knit. The women represented by the Accused were concerned with Belinda Lederer as well as themselves. The Accused was told by his clients to try to get the District Attorney to accept a plea to manslaughter from Belinda, plus immunity for them. In addition, there was some question as to whether the Accused's clients would take the 5th Amendment in the event of a trial. The clients instructed the Accused to tell the District Attorney that they would testify only if all were granted immunity."

The Trial Board made the following finding on the conflict of interest charge:

"The trial board unanimously considers that the Accused's representation of the clients enumerated in paragraph III of the first cause of complaint falls within the provisions of D.R. 5-105 relating to multiple employment and conflict of interest. The Accused admitted this (Tr. 210).

"The trial board finds, however, that each client did consent to the Accused's representation of her (see exhibit 5). A majority of the trial board further found that the evidence established that a full and complete disclosure had been made to each client by the Accused (Tr. 237; 255-56). In so deciding, the majority relied upon exhibit 5 and upon the Accused's testimony. The dissenting member found clear and convincing proof of consent, but no clear and convincing proof of full disclosure within the meaning of D.R. 5-105(C)."

The Disciplinary Review Board held that "there was a potential conflict in representing all the females," but concluded as follows:

"As to this charge the Trial Board found the Accused not guilty essentially because the clients consented after full disclosure. The record supports this finding (Ex. 5)."

In determining whether a conflict of interest exists for purposes of DR 5-105(A), it is instructive to consider some of the ethical principles on which the

disciplinary rule is based. Ethical Considerations 5-14 and 5-15 of the Code of Professional Responsibility offer guidance in this area. EC 5-14 provides:

"Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant." (Footnotes omitted)

EC 5-15 states in part:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially." (Footnote omitted)

It is also useful to examine the predecessor to DR 5-105. Rule 7 of the Oregon State Bar's Rules of Professional Conduct was in effect until 1971, and it provided in part:

"* * *. A member of the state bar shall not represent conflicting interests, except with the express consent of all parties concerned after a full disclosure of the facts, and then only when acting in the capacity of arbitrator. Within the meaning of this rule, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which his duty to another client requires him to oppose."

Finally, as stated in Drinker, Legal Ethics 104 (1953), with reference to Canon 6 of the Canons of Professional Ethics of the American Bar Association (superseded by the Code of Professional Responsibility, including Disciplinary Rule 5-105):

> "In observing the admonition of Canon 6 to avoid the representation of conflicting interests, the lawyer must have in mind not only the avoidance of a relation which will obviously and presently involve the duty to contend for one client what his duty to the other presently requires him to oppose, but also the probability or possibility that such a situation will develop. * * *"

In short, if the representation of multiple clients is such that the lawyer's independent professional judgment on behalf of one client *will be* adversely affected (an "actual" conflict), or *is likely to be* adversely affected (a "potential" conflict), the representation is improper unless the exception provided in DR 5-105(C) applies.

It follows that the issues to be decided are: (1) whether there existed a conflict of interest, either actual or potential, and (2) if so, whether the requirements of DR 5-105(C) for disclosure and consent were met.

*The existence of a conflict.*

In his testimony, the accused admitted that at least a *potential* conflict of interest existed in the representation of the 14 women. According to the accused, that conflict arose from the fact that some of his clients were potential criminal defendants. The accused took the position, however, that the interests of his clients would not diverge and an *actual* conflict would not exist unless or until one or more of his clients was formally charged with a crime.

We agree with the Bar, however, that by focusing on the *potential* conflict that would arise if one of his clients were charged, the accused overlooked a more immediate *actual* conflict of interest. The evidence discloses that by representing the 14 women at the

[ 523 ]

preindictment stage, the accused placed himself in a position where the exercise of his independent professional judgment on behalf of one client would be adversely affected by the differing interests of the other clients and of the group. The interests of the 14 women were *not* identical, particularly in light of their varying degrees of involvement in the crimes arising out of the killing of the sheriff's deputy. Because of this, the accused could not freely advise one client in regard to such critical decisions as whether to plea bargain, testify in the trial of Belinda Lederer, or plead the Fifth Amendment, without weighing the consequences and disadvantages to another client.

As an example, it might have been in the interest of one client to accept an offer of immunity in exchange for her testimony, whereas it might have been in the interest of another client that *no one* testify unless *all* were granted immunity. As a result, the loyalty of the accused to each of these 14 clients, as individuals, was divided and his effectiveness in the representation of each was lessened at the critical preindictment stage.

The accused requests that the court view this proceeding in light of the fact that the 14 women came to him as a group or "family." This fact is no excuse, but should rather have served as a warning to the accused that he might be placing himself in a position where he would have to subvert the interests of one or more of the group, as individual clients, to that of the group. In short, the contention of the accused that no actual conflict of interest would arise until one client was formally charged with a crime is without merit. Accordingly, we hold that in addition to the potential conflict admitted by the accused, an actual conflict of interest existed at the preindictment stage for the purposes of DR 5-105(A).

## The requirements of DR 5-105(C)

As previously noted, once a conflict of interest is found within the provisions of DR 5-105(A), the

representation is improper unless the exception provided by DR 5-105(C) applies. DR 5-105(C) permits the representation of multiple clients:

"* * * if it is obvious that he [the lawyer] can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Although this court has not addressed the apparent requirement that it be "obvious that he [the lawyer] can adequately represent the interest of each,"[2] we have discussed the requirement of full disclosure. In *In re Boivin,* 271 Or 419, 424, 533 P2d 171 (1975), we stated:

"To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but *he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel,* with undivided loyalty to the interests of each of them. See Wise, Legal Ethics 77 (2d ed 1970); Patterson and Cheatham, The Profession of Law 232, 235 (1971); Drinker, supra at 121 [Legal Ethics (1953)]; and Annot., 17 ALR3d 835, 838-39 (1968)."[3] (Emphasis added)

---

[2] *See* n.5.

[3] In *In re Boivin,* 271 Or 419, 424, 533 P2d 171 (1975), we went on to note that in certain cases even the consent of the clients after full disclosure may not be sufficient to make the representation proper:

"Indeed, it has been held that even such a full disclosure by a lawyer may not of itself afford complete exoneration. Thus, as stated in *Kelly v. Greason,* 23 NY2d 368, 296 NYS2d 937, 244 NE2d 456, 462 (1968):

" '* * * [T]he unsophisticated client, relying upon the confidential relationship with his lawyer, may not be regarded as able to understand the ramifications of the conflict, however much explained to him * * *.' "

"As also stated by Wise, supra at 258 [Legal Ethics (2d ed 1970)]:

" 'The consent of both clients does not of itself accord complete exoneration. Even if obtained after full disclosure, the consent does not

Both the Trial Board and the Disciplinary Review Board found that the clients consented to the multiple representation after full disclosure. In support of its finding, the Trial Board cited Exhibit 5 (the proceedings before Judge Frye), the testimony of the accused, and the testimony of Beverly H. Brooks, one of the accused's clients. The Disciplinary Review Board relied solely upon Exhibit 5.[4] The accused relies upon these same parts of the record to support his contention that full disclosure was made.

It is clear from an examination of the record of the proceedings before Judge Frye (Exhibit 5) and the transcript of the testimony in this proceeding that the conflict of interest that was explained to the clients was the *potential* conflict that would arise if one or more of the women were indicted. The following is found in Exhibit 5:

"MR. PORTER: Your Honor, if I could just say a word about the point Mr. Hudson brought up about conflict of interest for the benefit of Mr. Hudson and, perhaps, for my clients.

"The conflict of interest I had before, as I am sure the Court is aware, was between my representing Mr. Brooks and these women. There is no such conflict between representing these women and Miss Lederer because I have never represented Miss Lederer.

"Now, *it is conceivable that conflicts could arise if charges were filed against any of my clients where one might have to testify against another.*

"If that does arise, then, of course, I will withdraw and see that other counsel are retained."

In this proceeding the accused testified concerning the disclosure made to the 14 women as follows:

relieve the attorney of searching his conscience to discover any latent impropriety not readily perceptible to the consenting laymen." 271 Or 424-25.

[4]The relevant portions of the decisions of the Trial Board and Disciplinary Review Board are quoted above.

"Q. Now, you had a hearing in Judge Frye's office on the 28th, and it had to do with a conflict of interest, and that was at your request. Is that right?

"A. That's right.

"Q. This is in the record, but did you in open court at that time explain that if a conflict—Well, at that time nobody had been charged with anything, had they?

"A. No.

"Q. *And you explained that if there were charges filed, then you would immediately withdraw?*

"A. *That is correct.*

"Q. Then did you go back to your office and explain *that* to the people?

"A. That's right. We had a meeting in my office, went over it all again.

"We had been over it before, but I was aware that one indictment could make me withdraw from representing them all.

"I made it very clear to them why, and they consented to go ahead.

"Q. So it's not only on record on page 40 of Judge Frye's transcript, but you did go back to your office and explain it?

"A. That's right."

Beverly H. Brooks, one of the accused's clients, also testified as follows:

"Q. Do you remember a hearing in Judge Frye's courtroom?

"A. I remember hearings in Judge Frye's courtroom.

"Q. After that Mr. Porter represented the other members of the family, didn't he?

"A. Yes.

"Q. And *did he explain to you in his office subsequent to that that there might be a possible conflict, and if it came he would have to do something about it?*

"A. *Yes.* That was—Charlie did talk about that, yes.

"Q. *That if somebody were charged with something and they had to be a witness, then he would have to withdraw?*

"A. *Yes.* You also have to understand that I do not understand a lot of the legal—the way things are done through the legal processes.

[ 527 ]

"Q. He didn't have to withdraw from your divorce situation?

"A. No.

"Q. But as far as the criminal situation he would have if some of them were—

"A. He did say that.

"Q. He explained that."

After a review of the whole record and, in particular, the foregoing parts of the record, we find that the evidence supports the conclusion of the Trial Board and the Disciplinary Review Board that the accused made full disclosure of the *potential* conflict of interest that would arise if one of the women were charged with a crime, and that each client consented to the multiple representation.

There is no evidence in the record, however, that full disclosure was made of the *actual* conflict of interest that existed at the preindictment stage. The fact that the *potential* conflict that would arise if one client were charged with a crime was disclosed does not remedy the failure to disclose the *actual* conflict of interest. As noted in *In re Boivin, supra,* the lawyer "must explain to them [the parties] *the nature of the conflict of interest in such detail* so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them." (Emphasis added) 271 Or at 424. Under these facts and circumstances, it was improper and unethical for the accused to undertake the representation of the 14 women.[5]

---

[5] Because we have found that the full disclosure requirement of DR 5-105(C) was not met, we need not address the apparent further requirement of DR 5-105(C) that it be "obvious that he [the lawyer] can adequately represent the interest of each."

This is troubling language. The Bar contends that DR 5-105(C) states a two-part test. The issue of consent after full disclosure is not even reached until the initial requirement that "it is obvious that he [the lawyer] can adequately represent the interest of each" is satisfied. The Bar argues that this requirement embodies the policy that differing interests may be represented only in rare cases. The following ethics opinions provide

We do not question the good faith of the accused in his attempt to explain to his clients what he then considered to be no more than a potential conflict of interest. We also recognize that until our decision in this case, this court has not had occasion to discuss the requirements of DR 5-105 as applied to multiple representation in criminal cases and that, as a result, the lawyers of this state have perhaps not had adequate guidance in such cases. Nevertheless, and for the reasons previously stated, we are compelled to the conclusion that the conduct of the accused was improper and unethical and that such conduct cannot be condoned by this court. It follows that the accused must be reprimanded for such conduct and this opinion shall serve as such a reprimand.

We do, however, agree with the findings of the Trial Board and Disciplinary Review Board that the accused is not guilty of the second and third charges of alleged unethical conduct.[6]

Accused reprimanded.

---

support for the Bar's position by treating the requirement that adequate representation be obvious as a separate standard: Opinions of the Committee on Legal Ethics of the Oregon State Bar numbers 218 and 376; ABA Formal Opinion number 331 (12/15/72); ABA Informal Opinions numbers 1235 (8/24/72) and 1282 (11/21/73).

To read the language of DR 5-105(C) literally, however, would make the representation of conflicting interests nearly impossible. The difficulty lies in the word "obvious." Once it is shown that the exercise of the lawyer's independent professional judgment would be or would likely be adversely affected (DR 5-105(A)), how could it ever be *"obvious"* that he could adequately represent the interest of each party?

In this regard it is worth noting that New Jersey, in enacting DR 5-105(C), modified the wording to permit the representation "if he [the lawyer] *believes* that he can adequately represent the interests of each and if each consents to the representation after full disclosure * * *." (Emphasis added)

[6] Because of this disposition, we need not consider the fourth charge by the Oregon State Bar, the "conduct as an aggregate" charge.