# MYHRVOLD, *Respondent,*
## *v.*
# SULLIVAN, *Appellant.*
# (No. 106672, CA 12430)

595 P2d 494

[349]

Scott McAlister, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Paul J. DeMuniz, Salem, argued the cause for respondent. With him on the brief was Garrett, Seideman, Hemann & Robertson, P.C., Salem.

Before Schwab, Chief Judge, and Tanzer, Richardson and Roberts, Judges.

TANZER, J.

## TANZER, J.

Petitioner Myhrvold was convicted of first-degree rape after a trial at which he and two codefendants were represented by the same attorney. He sought post-conviction relief on the ground that he had been denied effective assistance of counsel and due process of law in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 11 of the Oregon Constitution. The post-conviction trial court granted relief, and the state appeals. The issue is whether petitioner was denied effective assistance of counsel due to a conflict of interest among the codefendants. We find no conflict of interest and reverse.

Myhrvold and two others, Morton and Bethell, were charged in a single indictment with first-degree rape arising from the same incident. Bethell retained the services of a law firm and consulted with one of its attorneys.[1] Thereafter, Myhrvold and Morton consulted Bethell's attorney, who agreed to represent them if there was no conflict of interest between them and Bethell.[2] The three defendants discussed the matter among themselves and found no conflict. Together, they reviewed their versions of the events in question with the attorney on three or four occasions before trial, and no inconsistencies in their stories were found.[3] Bethell admitted having had intercourse with the alleged victim but claimed that it was with her consent, while Myhrvold and Morton denied having had any intercourse or sexual contact with the

---

[1] The codefendants were interviewed by one attorney and represented at trial by another attorney in the same firm.

[2] The professional standards and ethical problems relating to the joint representation of criminal codefendants are discussed in *In re Porter,* 283 Or 517, 584 P2d 744 (1978). Here, we address only defendant's constitutional right to effective assistance of counsel rather than the propriety of undertaking joint representation.

[3] There is no evidence in the record to support the post-conviction trial court's finding that the attorney knew or should have known that the codefendants would give conflicting testimony. The testimony of petitioner and the lawyer are both to the contrary.

[351]

alleged victim. Their versions of the transaction were all consistent.

The primary question for the jury at defendants' consolidated trial was whether to believe the victim or the defendants. The victim, 16, testified that she had been acquainted with the defendants for several years but had never dated any of them. At about 10:30 p.m. on the night in question, she accepted their offer to give her a ride from the town of Scio to her home several miles away. After a stop for defendants to obtain more beer from the back of the pickup, they drove toward the victim's home. However, they turned off that route at a "Y" intersection about a mile from her house and parked the truck at a secluded place on Roger's Mountain, where Bethell said they were going to shoot deer. Up to this point, the victim's and defendants' versions of the events differ only as to details which are not significant for purposes of this opinion.

The victim testified that after parking the truck, defendants got out of the truck to get more beer. After they returned, all four sat in the truck for several minutes. Soon, Bethell began making suggestive remarks to her; she replied that she wanted to go home. He told her that she was not going home until he got what he wanted. Then he grabbed her wrists and attempted to undo her pants. She tried to stop him, but he was too strong; she screamed, and he threatened to hit her in the mouth or tape it shut. She testified that Bethell then asked Myhrvold and Morton to hold her down; they grabbed hold of her arms and pinned her to the seat. While she continued to struggle, Bethell took off her pants and had intercourse with her. Then Myhrvold held her down while Morton had intercourse with her. After that, Myhrvold did the same while one or two of the others held her. She continued to scream, and they continued to threaten her and tell her to shut up. Finally, Bethell had intercourse with her for a second time.

After the victim dressed, they drove back down the road and let her out at the "Y" intersection, about a mile from her home. She sought help at the nearest house. Her mother and the police were called; after they arrived, the victim was taken to the hospital for an examination. The remainder of the story is not relevant here.

Bethell was the first defendant to take the stand. He testified that after they parked the truck on Roger's Mountain, they sat in the truck for a while and then he said to the victim, "I would like to play." Soon they undid each other's pants, and she pulled her pants down. Myhrvold and Morton got out of the truck, and Bethell and the victim lay down on the seat. He was too drunk to have intercourse with her, so he asked if she wanted to have one of the other guys, and she said "okay." He called Myhrvold, who went up to the cab while Bethell went to the back of the truck. When Myhrvold returned, he told Morton, "It's your turn," and Morton took his turn in the cab. Bethell testified that he did not know what the other two did in the cab. Then he returned to the cab and had intercourse with her. At no time, according to Bethell, did she object in any way.

On cross-examination, Bethell amplified his description of Myhrvold's activity in the cab. Bethell had no watch, but he estimated that he and Morton waited for five to ten minutes while Myhrvold was in or near the cab of the truck. Bethell also testified that Myhrvold did not get into the cab right away, but was just "checking it out" and that he inferred that "instead of having intercourse with her right then, he stuck his nose up there." He explained that he was not watching, but "his feet were still out of the pickup, so what else could [he] be doing? * * * I'm just estimating on that."[4] Bethell did not remember if Myhrvold said anything when he returned to the back of the pickup.

[4] Myhrvold testified at the post-conviction trial that he was surprised by this portion of Bethell's testimony.

Myhrvold's account of his actions was slightly different from Bethell's. According to him, after they parked the truck on Roger's Mountain, they sat listening to the radio for a few minutes until he looked over and saw the victim's pants down below her knees. Bethell nudged him, and he and Morton then got out of the pickup and waited by the tailgate. Several minutes later, Bethell got out and told him to go up to the cab. Myhrvold approached the cab on the driver's side and saw the victim lying on the seat. He leaned into the pickup for about a minute, looked at her, thought about what he would do, and then backed off. He did not get up on the seat and did not have intercourse with her. Instead, he walked back to the tailgate and told Morton to go ahead.

On cross-examination of Myhrvold, the prosecutor emphasized the inconsistencies between Bethell's and Myhrvold's testimony about the latter's behavior:

"Q Did you hear him [Bethell] testify when he saw you go up there, he saw you laying on the seat with just your feet sticking out[5] and you were in there for about five minutes?

"A I don't recall him saying that.

"Q You don't recall him saying that—but that isn't what happened?

"A No—well, no. I wasn't laying in the seat."

Myhrvold contends that Bethell's testimony, especially as highlighted by the prosecutor's cross-examination of Myhrvold, damaged his credibility. He argues that if his attorney had not been fettered by his duty to Bethell, he could have challenged the accuracy of the latter's testimony about Myrhvold.

██ The right to effective assistance of counsel guaranteed by the Sixth Amendment requires that such assistance be unimpaired by counsel's simultaneous representation of conflicting interests. *Holloway v. Arkansas,* 435 US 475, 482, 98 S Ct 1173, 55 L Ed 2d

---

[5] This characterization of Bethell's testimony was not completely accurate, but defendants' attorney made no objection.

426 (1978); *Glasser v. United States,* 315 US 60, 70, 62 S Ct 457, 86 L Ed 680 (1942).[6] The assistance of counsel is among the "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Holloway v. Arkansas,* 435 US at 489, quoting *Chapman v. California,* 386 US 18, 23, 87 S Ct 824, 17 L Ed 2d 705 (1967). Where there is an actual conflict of interest among codefendants represented by a single attorney and the defendants have not waived their rights to effective assistance of counsel, reversal of their convictions is required even without a showing of prejudice.

Representation of codefendants does not necessarily deny a defendant's right to counsel. Indeed, joint representation in certain cases may benefit each of the codefendants. *Holloway v. Arkansas,* 435 US at 482-83. Substantial inconsistency in the defenses tendered by joint defendants may infect joint representation to the point of a denial of the right to counsel, but not every inconsistency in the testimony of codefendants amounts to a conflict of interest. A conflict of interest arises "whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Foxworth v. Wainwright,* 516 F2d 1072, 1076 (5th Cir 1975). An inconsistency or conflict between codefendants does not violate the right to effective assistance of counsel if it is irrelevant or merely hypothetical; a violation exists only if the conflict is actual and significant. *United States v. Alvarez,* 580 F2d 1251, 1255 (5th Cir 1978).

In this case, the two inconsistencies between the testimony of Bethell and that of Myhrvold were not significant in relation to the issues of the trial. The first inconsistency was that Myhrvold testifed on

---

[6] Although both these cases involved appointed counsel, other cases apply the same principle to retained counsel as well. *See United States v. Alvarez,* 580 F2d 1251, 1256 (5th Cir 1978).

cross-examination that he leaned into the cab of the pickup truck for "maybe a minute"; when Bethell was asked on cross-examination how long Myhrvold was at the front of the pickup, he stated, "I couldn't say. I didn't have a watch. I could estimate approximately five, ten minutes, I don't know." Given Bethell's lack of certainty, the testimony of both men that they had been drinking all day and paid little attention to what the other did in the cab, the damage to Myhrvold's credibility, if any, was negligible.[7]

The second inconsistency was that Myhrvold testified that he leaned into the truck, looked at the victim, and then backed off; Bethell testified, again on cross-examination, that he "estimated" from Myhrvold's position that Myhrvold had had some sexual contact with the victim.[8] Again, Bethell's statement was admittedly an inference; he also testified that he was not watching what Myhrvold was doing.

Neither codefendant contradicted Myhrvold in any significant way. Both Myhrvold's and Bethell's accounts contradicted the victim's testimony that she had been forcibly raped with two or three of the defendants present in the cab throughout the incident. Viewed in relation to the victim's version of the incident, the discrepancies in Bethell's and Myhrvold's testimony were insignificant because nothing in Bethell's account tended to confirm the victim's version of Myhrvold's actions. Bethell and Myhrvold agreed that none of the three codefendants forced the victim to engage in any sexual activity. The testimonial discrepancies were within the expected range of variation of human memory and did not relate significantly to any material issue at trial. Therefore, we conclude that this record discloses no conflict of

---

[7] In fact, if there had been absolutely no discrepancies in their testimony, the jury might well have inferred that their accounts were too pat and had been fabricated.

[8] Although Bethell's testimony on this point is vague and inartful, we infer that the gist of his testimony, set out on page 5, *supra,* is that he thought Myhrvold had sexual contact with the victim.

interest between these two codefendants. It follows that there was no denial of the effective assistance of counsel.

Reversed.