Argued and submitted April 3, public reprimand ordered June 5, 1984

In re Complaint as to the Conduct of

JAMES P. O'NEAL,
*Accused.*

(OSB 81-74; SC 29926)

683 P2d 1352

Lyle C. Velure, Eugene, argued the cause and filed the brief for the accused.

A.J. Morris, Eugene, argued the cause and filed the brief for Oregon State Bar.

## PER CURIAM

In this disciplinary proceeding brought by the Oregon State Bar the accused is charged with five counts of unethical conduct. Specifically, the charges are: (1) the representation of multiple defendants when their interests were adverse, an alleged violation of DR 5-105; (2) the improper solicitation of employment, an alleged violation of DR 2-103(A), DR 1-102(A)(4), and ORS 9.510; (3) the making of a false statement about another attorney, an alleged violation of DR 1-102(A)(4); (4) the making of a loan to the accused's client, an alleged violation of DR 5-103(B); and (5) misrepresentation to the Oregon State Bar, an alleged violation of DR 1-102(A)(4).[1]

The Trial Board found the accused guilty of the first charge and recommended a public reprimand. The Disciplinary Review Board found the accused guilty of the first charge and of violating DR 2-103(A)[2] on the second charge and recommended a suspension of 90 days. The accused petitions this court to review and reject the opinion of the Disciplinary Review Board on the ground that there is not clear and convincing evidence to support its conclusions.

On the first charge, the representation of multiple defendants when their interests are adverse, DR 5-105, the following facts are pertinent. Jesse Vanarsdall was indicted in early February, 1981, on charges of "Delivery of Controlled Substance" and "Criminal Conspiracy." The indictment named Stanley Everidge as one of the co-conspirators. On the same date Everidge was indicted on the charges of "Delivery of Controlled Substance" and "Possession of Controlled Substance." Later in February, 1981, Vanarsdall and Everidge were arrested. Everidge retained the accused to represent him. Vanarsdall received a court appointed attorney, Jack Banta,

---

[1] The Bar's complaint alleges a violation of DR 2-103(A) (B)(C)(E) in count two. There is no (E). This was evidently intended to be (D). It is apparent, however, that only subsection (A) could be applicable to the facts of this case. Count two also alleged a violation of ORS 9.500. That statute refers to solicitation by a nonlawyer and obviously has no application to this case.

[2] The Disciplinary Review Board's opinion states in its "Conclusion and Analysis," that the accused violated DR 2-102(A). This appears to be a typographical error because DR 2-102 deals with firm names and letterheads and there is nothing in this record on that subject. It should be DR 2-103(A).

who appeared at the bail hearing. After Vanarsdall's release from jail he was told by Everidge that the accused "seemed to be helping me out real well." According to Vanarsdall's testimony he then called the accused and retained the accused to represent him on the criminal charges. The accused had both Vanarsdall and Everidge sign a "Criminal Multiple Client Full Disclosure Form" which indicated that anticipated employment for legal services would continue until each entered a plea.

The police reports on which the indictments were based were not accurate in the descriptions of Vanarsdall and Everidge. The accused believed he could get a negotiated plea for both defendants on this misidentification. The accused testified before the Trial Board that he felt he was able to represent both Vanarsdall and Everidge because they both were charged with delivery of a controlled substance on the same date to the same person and only Vanarsdall was charged with conspiracy. He thought he was acting in accordance with *In re Porter,* 283 Or 517, 584 P2d 744 (1978). The accused also testified that he was able to get "a deal" for both Vanarsdall and Everidge from the District Attorney. Everidge accepted it but Vanarsdall did not. The accused then refused to go to trial with Vanarsdall and told him he should get another attorney. There is also evidence in the record that the deputy district attorney who was handling both cases told the accused she believed there was a conflict of interest at about the same time she and the accused were discussing pleas. According to her testimony the accused withdrew as attorney for Vanarsdall shortly thereafter.

DR 5-105 provides:

"(A)  A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"(C)  In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of

such representation on the exercise of his independent professional judgment on behalf of each.

"* * * * *"

In finding the accused guilty of violating DR 5-105 the Trial Board made these "Findings of Fact":[3]

"The Accused admitted an actual conflict of interest existed. It is our opinion an actual conflict of interest existed because the indictments of both Jesse Vanarsdall and Stanley Everidge included a charge they were co-conspirators in a criminal conspiracy. The Accused's opinions that a factual error in the criminal conspiracy indictment as to the height of Jesse Vanarsdall, and that the District Attorney would not allow a plea bargaining for testimony of one co-conspirator against another, could not assure both clients of the exercise of his independent professional judgment in behalf of each client.

"The Accused's explanation that his representation of Jesse Vanarsdall would be limited (not include representation at trial) was not in the best interest of either Jesse Vanarsdall or Stanley Everidge. There is no evidence in the record to indicate that the circumstances of the actual conflict were explained to or understood by either Vanarsdall or Everidge. The record indicates that the Accused's explanation was limited to his merely having the client execute the Criminal Multiple Client Full Disclosure forms. As to the disclosure forms dated March 2 and 3, 1981, the same provides no information to Everidge or Vanarsdall as to the nature of the specific conflict of interest involved as to the Accused's representation of both co-conspirators.

"The Accused withdrew as counsel for Jesse Vanarsdall after the conflict of interest was discussed with the District Attorney's office on April 30, 1981, nearly two months after agreeing to represent Jesse Vanarsdall, but unethical conduct had already occurred. In addition, Jesse Vanarsdall was already represented by Jack L. Banta, attorney at law, as to the criminal indictment before the Accused agreed to represent him."

The Disciplinary Review Board agreed that "* * * both a potential and actual conflict of interest existed at the time [the

---

[3] The findings are not accurate in stating that "the indictments of both Jesse Vanarsdall and Stanley Everidge included a charge they were co-conspirators." Only Vanarsdall's indictment included a charge of criminal conspiracy; it named Everidge as the co-conspirator.

accused] sought to represent Mr. Vanarsdall" and that "[t]he evidence demonstrates that the Accused actively undertook to represent Mr. Vanarsdall when he knew, or certainly should have known, that this presented a potential conflict of interest for both Mr. Vanarsdall and his client, Mr. Everidge."

The accused testified that he was aware of the conflict, but he justified his multiple representation because it was limited to negotiating the guilty pleas. Where a conflict exists, the fact that representation may not include going to trial does not solve the problems inherent in such conflicts. The lawyer may be unable to exercise independent judgment in favor of a co-defendant in plea negotiations as well as at trial. The accused asserted that the prosecutor would not accept bargaining for testimony of one co-conspirator against the other. But this is only one of the conflicts that may arise.

> "In the plea bargaining context, for example, a defense lawyer, attempting to persuade a prosecutor that a particular defendant deserves leniencies, should emphasize all favorable circumstances relating to the defendant. * * * When a defense lawyer represents codefendants, comparisons between clients are unavoidable whenever counsel emphasizes a particular point on behalf of a defendant. The lawyer therefore either must forego certain arguments on behalf of one client to avoid prejudicing a second or make the arguments and risk a more serious disposition for the second defendant." (Footnotes omitted.) Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal,* 64 Vir L Rev 939, 942-43 (1978).

Other problems exist as well:

> "Even where the government is willing to negotiate with all defendants, the spectre of a deal that works to the detriment of one or more of them remains. For example, the prosecutor may be amenable to a lesser sentence for some defendants if the 'more culpable' defendants plead guilty to more serious charges. The result may be that one or more of the defendants will be the sacrificial lambs of a package deal. Again, counsel's loyalties are irreparably divided. To further the interests of some defendants, others must be convinced to acquiesce. In such cases, the guilty pleas of one or more of the defendants may be held to have been involuntarily entered.
>
> "* * * * *
>
> "Whether or not a bargain is struck with the prosecution, there is significant pressure on the attorney to keep his

clients' pleas consistent with each other despite potential differences in their situations." (Footnote omitted.) Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn L Rev 119, 126 (1978).

We have pointed out previously in *In re Hershberger*, 288 Or 559, 606 P2d 623 (1980), that the ethical principles on which DR 5-105 is based are contained in Ethical Consideration 5-15 of the Code of Professional Responsibility, which provides:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potential differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. * * *." (Footnote omitted).

We have also referred to Wise, Legal Ethics (2d ed 1970) as summarizing the rule in application. *See In re Hershberger*, 288 Or at 567 and *In re Samuels/Weiner*, 296 Or 224, 230, 674 P2d 1166 (1983). Wise writes:

"* * * If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or with a former client, or a conflict between the interests of any client and that of the attorney, or may require the use of information obtained through the service of another client, the employment should be refused." Wise, Legal Ethics 273 (2d ed 1970).

In relying on *In re Porter, supra,* as permitting this multiple representation of parties, the accused states that the test is whether the attorney believes, in his professional judgment, that he can adequately represent multiple defendants. That is not the test in *Porter*. The accused is referring to the exception provided in subsection (C) of DR 5-105 which states, "* * * a lawyer may represent multiple clients if it is

obvious that he can adequately represent the interest of each
* * *." The court in *Porter* specifically found it unnecessary to
address that language of the Disciplinary Rule but discussed it
in a footnote. There we pointed out that "New Jersey, in
enacting DR 5-105(C) modified the wording to permit the
representation '[if [the lawyer] *believes* that he can adequately
represent the interest of each and if each consents to the
representation after full disclosure * * *.' " (Emphasis added.)
283 Or at 528-29, note 5. We have not adopted the New Jersey
modification.

■ ■      Our DR 5-105 requires that it be *obvious* that the
lawyer adequately can represent the interest of each where
representing multiple clients will or will likely adversely affect
the exercise of the lawyer's independent professional judg-
ment. The likelihood of conflicts arising during the represen-
tation of multiple criminal defendants is well known. EC
5-17.[4] The American Bar Association Project on Standards for
Criminal Justice, Standards relating to the Prosecution Func-
tion and the Defense Function § 3.5(b) (Approved Draft 1971)
states:

> "The potential for conflict of interest in representing
> multiple [criminal] defendants is so grave that ordinarily a
> lawyer should decline to act for more than one of several co-
> defendants except in unusual situations when, after careful
> investigation, it is clear that no conflict is likely to develop
> and when the several defendants give an informed consent to
> such multiple representation."

Here, many of the problems that could arise in representing
codefendants were potentially present. It was not obvious that
the accused could represent the interests of both clients

---

[4] EC 5-17 provides:

"Typically recurring situations involving potentially differing interests are
those in which a lawyer is asked to represent co-defendants in a criminal case, co-
plaintiffs in a personal injury case, an insured and his insurer, and beneficiaries of
the estate of a decedent. Whether a lawyer can fairly and adequately protect the
interests of multiple clients in these and similar situations depends upon an
analysis of each case. In certain circumstances, there may exist little chance of the
judgment of the lawyer being adversely affected by the slight possibility that the
interests will become actually differing; in other circumstances, the chance of
adverse effect upon his judgment is not unlikely."

adequately.[5] We find the accused guilty of the violation of DR 5-105(A).[6]

On the second charge, the improper solicitation of employment, the Disciplinary Review Board found the accused guilty of violating DR 2-103(A).

DR 2-103(A) provides:

"(A)   A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2-103(C)."

■■   The charges against the accused must be proved by clear and convincing evidence. *In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1982). As in the previous charge of conflict of interest we make our own independent review of the evidence, *In re Thomas,* 294 Or 505, 521, 659 P2d 960 (1983).

■   Vanarsdall's wife, Kimberelley Vanarsdall, was killed in an automobile accident on December 18, 1980. Sharon Adams, the complainant in this case, is Kimberelley's mother. At the time of the death, Vanarsdall was temporarily in California. Adams contacted James Spence, an attorney, about a wrongful death action. When Vanarsdall returned from California Adams encouraged him to see Spence about the wrongful death action. He did so on December 23, 1980, and signed a retainer agreement. Trouble developed between Adams and Vanarsdall when Vanarsdall learned that Adams and her boyfriend intended to get the money from the wrongful death action and prevent Vanarsdall from sharing it.

---

[5] We recently considered the application of DR 5-105 in a civil litigation setting in *In re Shannon,* 297 Or 168, 681 P2d 794 (1984). We concluded there was no violation of the rule because at the time the accused accepted the representation of both clients he knew there was the potential for a conflict of interest and adequately advised his clients. We also found no violation when the accused later represented both parties because the conflict had been resolved and the client had, in fact, consulted independent counsel. That fact situation is very different from this case. Here we conclude that a conflict of interest existed at the time the accused undertook the representation of both Vanarsdall and Everidge because the accused was employed to negotiate pleas for both defendants.

[6] Because it was not obvious that the accused could adequately represent the interests of both clients we do not reach the question whether there was an adequate disclosure by the accused.

Vanarsdall and Adams were also having problems over who should have custody of Vanarsdall's child.

On about February 22, 1981, Vanarsdall was arrested on the delivery of controlled substance and conspiracy crimes referred to in the first charge in this case. As pointed out there, he was represented initially by Banta, Spence's partner. According to Vanarsdall's testimony, he became dissatisfied with Banta and, acting upon Everidge's recommendation of the accused, Vanarsdall made an appointment to see the accused. Vanarsdall testified that the civil case was discussed at that time, and that Vanarsdall asked the accused to represent him in that case. The accused testified he thought he was the first attorney in the case. There is contradictory evidence, however, of how the accused came to represent Vanarsdall in the wrongful death case. According to Adams the accused made a telephone call to Vanarsdall's home while she was there. Adams testified that the accused told her that Spence and Banta were not qualified to handle the wrongful death case and that the accused told her he would represent Vanarsdall on the criminal case if he also were retained to handle the wrongful death case. In any event, the accused began to represent Vanarsdall in the wrongful death case, a retainer agreement was signed, and the accused filed a complaint shortly thereafter.

Spence, unaware of the accused's representation, heard on the radio that a complaint had been filed in the case. He testified that his firm had been conducting an investigation and was preparing a complaint. Spence wrote the accused that he had been representing Vanarsdall and Adams in the estate matter and would expect to be reimbursed. The accused did not respond to that letter. Spence then asked Jensen, his investigator, and Adams to talk to Vanarsdall. There is a sworn statement of Adams in evidence in which she detailed what she contends Vanarsdall told her on March 11, 1981 and what the accused told her by telephone at that time.[7] There is

---

[7] Adams's statement follows:

"On Wednesday, March 11, 1981, I went to Jesse Vanarsdall's house and asked him why he had changed attorneys and what was going on. He said that Attorney Jim O'Neal had come over to his house and said he had heard about him (Jesse) from 'Stan', that Mr. O'Neal said he had heard about the accident the day after it had happened and had checked it out and that he had been looking for

also a two page transcribed "interview" in evidence in which Jensen asked Vanarsdall a series of questions about how the accused came to represent him. It concludes:

> "* * * I just wanted to make sure that the contents of this statement by Sharon Baker was true to the best of your recollection. Uh, several things have been pointed out in the statement and you have read that and as far as you are concerned uh, Sharon Baker's statement is true and uh, you could probably add no more to that then?
>
> "Jesse—No."[8]

---

Jesse.

"Jesse then told me that Mr. O'Neal had said the following:

"1. That his present attorneys (Spence & Banta) didn't do these kinds of cases (wrongful death and personal injury) and were putting it on the shelf;

"2. That Spence and Banta had done nothing on the case and were just fooling around with it and that the complaint should have already been filed;

"3. That Jesse needed to file the complaint and get the case over with right away before Children's Services gave him problems because of the child and the drug charge against Jesse;

"4. That Mr. O'Neal had checked out the probate file and even took Jesse to look at it to prove that we weren't doing the things that needed to be done there;

"5. That, with the amount of money involved in the case, Spence & Banta should have posted Jesse's bail on the drug charge, and that Mr. O'Neal would take care of him and keep him out of jail if he had the wrongful death case;

"6. That Mr. O'Neal would get the money on the case within thirty days; and

"7. That Jesse should not talk or correspond any further with Spence & Banta.

"While I was there, Mr. O'Neal called Jesse on the phone and asked to speak to me. Mr. O'Neal then repeated to me all of the things listed above. When he told me that Spence & Banta had never handled a big personal injury case, I told him I had heard about one they had in Medford. He then said that was his case and that Spence & Banta had taken it from him when they dissolved their partnership. He said that Spence & Banta were incompetent in this area and that I should look at their business card to see that it didn't say that they specialized in personal injury claims like his card did. He also mentioned a small amount of money that he said Spence & Banta were suing for and that the case was worth much more. Mr. O'Neal also said there was a new law out which required something to be done within thirty days and that Spence & Banta didn't even know about it. Mr. O'Neal said he wanted me to sign some papers the next night and that we all had to agree on the whole thing to pull it off.

"Mr. O'Neal seemed to be trying to play on our emotions. He said that Danny Johnson was out running loose on the streets and that he was angry because my daughter had been splattered on the street and our attorneys were just messing around. * * *"

[8] Sharon Baker is Sharon Adams.

Approximately a month after filing the complaint the accused advised Vanarsdall that he should go back to Spence for representation on the civil case. He did. Spence filed a substitution of attorneys and notified the accused. That did not last long, however, because Vanarsdall returned to the accused and asked him to take over his representation again. The accused testified that he did not think Spence and Banta should have had the case in the first place because of their prior representation of Adams in a child custody matter involving Vanarsdall and his child. The accused also testified that their representation was inappropriate because Spence and Banta had told Vanarsdall that he would be entitled to only a minimum amount of money as he was separated from the deceased at the time of the accident, and that Vanarsdall was not the proper party to be the personal representative because he was mentally slow. A dispute had developed over who should be the personal representative, Vanarsdall or Adams. The accused also testified that Vanarsdall told him he did not feel as though he was the client, he thought Spence and Banta treated Adams as the client.[9] The accused again undertook representation in the matter and the case was later settled.

The Trial Board found the accused not guilty on the charge of solicitation, for a failure of evidence. The Trial Board stated: "We do not believe the Oregon State Bar has met its burden of proof that solicitation of employment occurred. Neither Jesse Vanarsdall nor Stanley Everidge supported the same in their testimony and Sharon Lee Adams was not a credible witness. * * *"

The Disciplinary Review Board found that the accused had solicited in violation of DR 2-103(A); however, the Board's own finding of facts indicate that the evidence does not establish that the accused compensated or gave anything of value to Vanarsdall, an element of the offense. At findings 9 and 10 the Board stated:

"9. [T]he accusation was made that [the accused] offered a reduced fee arrangement with Mr. Vanarsdall in order to solicit representing him in the criminal-charge case.

---

[9] When Vanarsdall returned to the Spence and Banta firm, Adams was referred to another attorney, Heiling, by Spence.

"10. This evidence, in balance, was not clear and convincing even given the totality of the circumstances. We find that the Bar has not proven that the Accused * * * did, in fact, offer a reduced fee arrangement to Mr. Vanarsdall. * * *"

Despite the acknowledged failure of proof of one element of the charge, the Disciplinary Review Board found that because the accused acquired the wrongful death case through "doubtful circumstances," he had violated the Disciplinary Rule. We are unable to accept this conclusion. Our review of the record uncovers no credible evidence that the accused offered Vanarsdall a reduced fee arrangement in order to secure his employment in the wrongful death case. We find the accused not guilty of violating DR 2-103(A).

The Trial Board also charged a violation of ORS 9.510. That statute provides:

"No attorney shall solicit business at factories, mills, hospitals or other places, or retain members of a firm or runners or solicitors for the purpose of obtaining business on account of personal injuries to any person, or for the purpose of bringing damage suits on account of personal injuries."

██ ██ Only Adams testified to facts that, if true, would support a solicitation charge. The Trial Board found the testimony of Adams not credible. We review the evidence independently but accord deference to the Trial Board's assessment of a witness's credibility. Although Vanarsdall told Jensen the written statement of Adams was true, *see* note 5, both he and his girlfriend testified that he did not read the statement when Jensen presented it to him, that he had been drinking and smoking marijuana at the time and was "stoned" and that he just went along with what Jensen said in order to get Jensen out of his house quickly because he thought he was a police officer. Vanarsdall also testified that he did not receive a call from the accused but voluntarily went to his office and that he initiated the discussion about the wrongful death case. Vanarsdall's girlfriend testified that she was with Vanarsdall on the day Adams said the call was received from the accused and that Vanarsdall had no telephone conversation with the accused on that date or any other time. There is no evidence that the accused knew at the time he agreed to represent Vanarsdall and had him sign a retainer agreement that there was another attorney on the case. There is evidence

that after Spence advised the accused that he had worked on the case and had a retainer agreement signed by Vanarsdall that the accused referred Vanarsdall back to Spence. We conclude the evidence is not clear and convincing that the accused violated ORS 9.510, and, therefore, find him not guilty on the charge.

On the third charge, that the accused made a false statement about attorney Heiling who represented Adams after Vanarsdall returned to the Spence and Banta firm, there is no evidence to support the charge. We find the accused not guilty of violating DR 1-102(A)(4).

On the fourth charge alleging that the accused loaned Vanarsdall $200, there is evidence from Adams that Vanarsdall told her the check was from the accused and that Adams drove Vanarsdall to the apartment complex where the accused lived to pick up a check from a mailbox. She did not see the signature on the check. Adams' fourteen year old son testified to the same effect. However, Vanarsdall and the accused both testified that there was no loan. A letter from the accused's bank states a search revealed no cancelled check made out to Vanarsdall. Vanarsdall testified that the check was a loan from a friend. We conclude there is insufficient evidence to find the accused guilty of violating DR 5-103(B).

On the fifth charge alleging that the accused misrepresented to the Oregon State Bar that Adams intended to drop her complaint against the accused there is evidence that the accused did write a letter to the Bar saying that he understood that to be the case. This was apparently based upon representations made to the accused by Vanarsdall after the wrongful death case was settled to everyone's satisfaction. Under these circumstances the evidence does not show that the accused knew his statements to be false or that he made the statement to the Bar recklessly without regard to its truth or falsity. We find no violation of DR 1-102(A)(4).

In summary, we find the accused guilty of violating DR 5-105 but we find the accused not guilty on the four other charges because the evidence is insufficient to meet the clear and convincing standard required in disciplinary proceedings. This opinion shall serve as a public reprimand. The Oregon State Bar is awarded its costs and disbursements.