Argued and submitted October 9, 1984, accused reprimanded July 9, 1985

In re Complaint as to the Conduct of
# WILLIAM BRANDSNESS,
*Accused.*

(82-14; SC S30591)

702 P2d 1098

Daniel O'Leary, Portland, argued the cause for the accused. With him on the brief were Robert K. Udziela and Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland.

John P. Cooney, Medford, argued the cause for the Oregon State Bar. With him on the brief was George A. Riemer, Portland.

Before Lent, Presiding Justice, and Linde, Campbell, Roberts, Carson, and Jones, Justices; and Peterson, Chief Justice, by stipulation.*

PER CURIAM

---

* Stipulation by parties on October 9, 1984, that Peterson, C. J., may hear oral argument tapes and participate in the decision of this case.

## PER CURIAM

In 1982,[1] the Oregon State Bar filed a complaint against the accused alleging that his representation of the husband in a dissolution proceeding constituted a conflict of interest in violation of DR 5-105, because the accused formerly had represented both the husband and wife in business matters and in the execution of mutual wills.

## BACKGROUND

On April 19, 1979, John Zingg retained the accused. Mr. Zingg, a short time before, together with his wife, Anita, had acquired an option to buy a retail business in Klamath Falls, where the accused practices law. The accused, after meeting with Mr. Zingg, Mrs. Zingg, the seller, the seller's lawyer, and an accountant, restructured the purchase, prepared documents and subsequently assisted in concluding the sale of the business corporation to the Zinggs. Mr. and Mrs. Zingg became jointly and individually liable on the security agreement and loan used to finance the purchase. The cash used to pay the seller was derived almost entirely from Mr. Zingg's earnings; because Mrs. Zingg did not work outside the home, her financial contribution to the purchase cannot be quantified. Mr. Zingg was general manager of the business, and Mrs. Zingg worked as a part-time salesperson. Mr. Zingg served as President of the corporation that ran the business, Mrs. Zingg was Secretary-Treasurer, and their daughter was Vice-President. The three comprised the Board of Directors and the shareholders of the business.[2] The accused served as corporate counsel. The accused and Mr. Zingg met occasionally to discuss business. Mrs. Zingg was not present at those meetings.

In December 1979, the accused prepared new wills modifying the simple mutual wills that Mr. and Mrs. Zingg had executed prior to retaining the accused. Apparently, the

---

[1] The Rules of Procedure applicable to this case are those adopted by the Board of Governors and approved by this court, effective January 18, 1982. *See* Rule 1.5(a), Rules of Procedure, effective January 1, 1985.

[2] A document in the record purporting to be minutes of the 1980 annual meeting of the shareholders lists John, Anita and Larisa Zingg as shareholders. The record does not disclose that shares were issued or the relative proportions of the interests of the shareholders in the corporation.

only modifications he made established the Zinggs' oldest child as guardian of the two younger children in the event both parents died during the younger childrens' minority, and provided for a trust during the minority of each of the younger children. About 10 months later, in October 1980, Mrs. Zingg met with the accused in his office and requested that he change her will without changing Mr. Zingg's. The accused explained that he could not do so without informing Mr. Zingg. When Mrs. Zingg persisted, the accused explained that he could not change her will because he represented Mr. Zingg. He advised Mrs. Zingg to consult another lawyer, which ultimately she did.

In April 1981, Mr. Zingg began to consider expanding the business through a franchising plan. Mrs. Zingg expressed reservations. Mr. Zingg and the accused agreed to call a meeting of the corporate directors to discuss the issue, and the meeting resulted in a unanimous resolution to empower Mr. Zingg to enter into franchise negotiations. The accused had the minutes of the meeting drawn up, but the next day, when asked to sign them, Mrs. Zingg wrote in the space reserved for her signature, "Against my will." At approximately the same time, she told the accused that she had retained her own lawyer. Shortly thereafter, in June 1981, Mrs. Zingg wrote to the accused stating that she had written a will superseding all prior wills, and that the new one was at the offices of another Klamath Falls lawyer. Further, the record clearly shows that at least by October 23, 1981, Mrs. Zingg had retained her own business lawyer.

Domestic relations between the Zinggs deteriorated, and on November 1, 1981, Mr. Zingg asked the accused to represent him in a dissolution proceeding. The accused agreed to do so and the next day filed the initial court documents and obtained a temporary restraining order granting Mr. Zingg the temporary use, possession and control of the business and restraining Mrs. Zingg from encumbering or disposing of the assets of the business. Mrs. Zingg subsequently filed a complaint with the Bar, leading to these proceedings.

The Trial Board found, among other things: that because Mr. Zingg was the alter-ego of the corporation, the accused's representation of the corporation was a representation of Mr. Zingg and not of Mrs. Zingg; that the accused

represented Mrs. Zingg in respect only to the will he drafted for her in December 1979; that thereafter, she was not his client; and that in November 1980, when the accused declined to represent her in drafting a revised will, he told her that he represented Mr. Zingg. The Trial Board concluded that the accused therefore did not violate DR 5-105 "in any respect," and recommended that the charges be dismissed.

The Disciplinary Review Board determined that "this case presents a closer question than that indicated by the Trial Board," and determined, among other things: that the accused represented both Zinggs in connection with the purchase and operation of the business; that his refusal to rewrite Mrs. Zingg's will in November 1980, and his statement that he represented Mr. Zingg effectively terminated his professional employment by her; and that thereafter the accused was Mr. Zingg's lawyer, not hers, and she knew it. The Disciplinary Review Board concluded that the Bar did not present clear and convincing evidence of a violation of DR 5-105 by the accused, and recommended that the charges be dismissed. The Bar seeks review.

## DISCIPLINARY RULE 5-105

■ In its complaint, the Bar charges the accused with violating DR 5-105, which provides:

"DR 5-105 Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment * * *."

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client * * *." [3]

Two aspects of the rule are not readily apparent from the precise wording of the rule. First, the words "conflicts of

---

[3] We conclude that the Bar's charge of violation of DR 5-105 has reference to DR 5-105(A) and (B). DR 5-105(C) provides an exception to the requirements of DR 5-105(A) and (B) when consent of the clients is obtained after full disclosure. In this case, there is no claim that Mrs. Zingg's consent was requested or obtained.

interest" do not appear in the rule; rather the rule is couched in terms of the adverse effect upon the exercise of the lawyer's independent judgment. However, by judicial interpretation, this disciplinary rule has been determined to concern what is commonly referred to as conficts of interest. *See In re Banks,* 283 Or 459, 476-77, 584 P2d 284 (1978); *see also In re Thorp,* 296 Or 666, 677, 679 P2d 857 (1984).

The second aspect not readily apparent is that this rule does not in terms apply to conficts generated by the lawyer's representation of a new or present client against a former client. "This befogged area" is one of the complexities of modern practice that the existing Code of Ethics does not cover. Denecke, *Complexities of Modern Practice Require Changes in Oregon Ethics Code,* 19 Will L Rev 621, 635 (1983). Both the American Bar Association and the Oregon State Bar have proposed rules to cover the situation.[4] However, we have held that despite its language, the current version of DR 5-105 does apply to a lawyer's conflict when representing a present client against a former client. *In re Banks, supra,* 283 Or at 476-78; *In re Thorp, supra,* 296 Or at 677.

Thus, DR 5-105, by its terms and by judicial interpretation applies to conflicts generated by the lawyer's simultaneous representation of two current clients (the so-called "open file" conflict) and by representation of a new or present client against a former client (the so-called "closed file" conflict). These two relationships that may give rise to a conflict have been characterized as "professional employment" and "professional relationship," respectively. *In re Adams,* 293 Or 727, 737, 652 P2d 787 (1982). Because, as discussed hereinafter, we conclude that the accused did not have a lawyer-client relationship with Mrs. Zingg at the time

---

[4] According to the Bar, under *proposed* DR 5-105 a "lawyer is not to represent a client if the representation of that client will be substantially adverse to the interests of a former client in a matter that is substantially related to the matter in which the lawyer previously represented the former client." Riemer, *Proposed Conflict of Interest Changes Warrant Careful Study,* Oregon State Bar Bulletin, May 1985, at 19. Rule 1.9 of the proposed ABA Model Rules provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation;"

of the alleged conflict herein, we do not further examine the particular aspects of a conflict generated by the simultaneous representation of two or more present clients.

■　The standard to be used in determining whether a "closed file" conflict exists has been variously stated. In *In re Banks, supra,* 283 Or at 477-78, this court said that DR 5-105 prohibited "anything from being done which would tend to affect a former client injuriously in any matter in which the former client has been represented." In commenting on another disciplinary rule (DR 7-101(A)(3)),[5] this court, in *In re Adams, supra,* 293 Or at 737, relying on the pre-Code case of *In re Nicholas D. Zafiratos,* 259 Or 276, 281, 486 P2d 550 (1971), approved the following language: "* * * [A] lawyer may not undertake litigation for a subsequent client which, if successful, might reasonably impose liability on a former client by reason of a transaction in which the lawyer represented the former client * * *." We recently quoted with approval the following language from Drinker, Legal Ethics 105 (1953), quoting Morrow, J., in *In re Boone,* 83 F 944, 952-53 (CCND Cal 1897):

> "The test * * * is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him and also whether he will be called upon, in his new relation, to use against his former client knowledge or information acquired through their former connection."

*In re Thorp, supra,* 296 Or at 679-80.

■　A "closed file" conflict arises when a lawyer represents a client who is in a position adverse to a former client in a matter[6] that is significantly related to a matter in which the lawyer represented the former client. Thus, a three-factor test

---

[5] DR 7-101(A)(3), provides:

"A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship * * *."

[6] DR 5-105(F) became effective on March 1, 1983. For our purposes herein, we adopt the definition of "matter" that presently appears in DR 5-105(F):

" 'Matter' includes any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties."

can be used to determine if a conflict exists. When the following factors co-exist, a conflict results:

1. The adverse party is one with whom the accused had a lawyer-client relationship;

2. The representation of the present client puts the accused in a position adverse to the former client; and

3. The present matter is significantly related to a matter in which the accused represented the former client.

We shall examine each of the three factors, in the light of the facts of this case.

### 1. Lawyer-Client Relationship.

On *de novo* examination of the record, ORS 9.536(3), we conclude that the accused and Mrs. Zingg had had a lawyer-client relationship. This relationship clearly included the work he did on her will. It also included the work he did relative to the acquisition of the business. The accused argues that the business was almost totally identified with Mr. Zingg, who conceived, paid for, and managed it, while Mrs. Zingg was a passive and silent participant — indeed, a participant in name only. Thus, according to the accused, in representing the business he really represented Mr. Zingg; Mrs. Zingg was never his client. The accused relies on *In re Banks, supra.* In *Banks,* a lawyer represented a closely held corporation. As part of that representation, he drafted several agreements and contracts. After some intramural difficulties, the lawyer represented the corporation against the president in a dispute over the interpretation and application of those documents. Rejecting the lawyer's argument that he had from the beginning represented the corporation as an entity, and not its president, this court held that because the president was the single dominating force behind the corporation, in essence its alter-ego, the lawyer's representation of the corporation was in fact a representation of the president. The lawyer was therefore guilty of a conflict in subsequently representing the corporation in a matter adverse to the president.

We find *Banks* inapposite. *Banks* stands for the proposition that a closely-held corporation and its dominating alter-ego president are so closely identified so as to preclude a lawyer who represents the corporation from appearing against the president. This holding does not logically imply that a

lawyer who represents a closely-held corporation and its dominating president *may* later represent that president against another shareholder and officer in that corporation. We determined that the lawyer in *Banks* could not represent the corporation or shareholders against the president; that does not mean he *could* have represented the president against the corporation, a non-dominant shareholder or other officer.

Here, the accused drafted a "Sales and Security Agreement" establishing Mr. and Mrs. Zingg as buyers of the business, indebted to the seller. This agreement imposed obligations on Mrs. Zingg and provided remedies against her in the event that these obligations were not met. He also drafted two documents entitled "Installment Note" and a document entitled "Promissory Note" to the same effect. While the direct verbal authorization to perform these tasks probably came from the mouth of Mr. Zingg, it is clear that they were performed with the authorization and at least partially for the benefit of Mrs. Zingg. Nothing in the later course of the accused's representation of the corporation alters the fact that, at its inception, he represented both of the marriage partners. This representation began with the events surrounding the drafting of the purchase agreement. It is conceivable that in a different situation, after the completion of the purchase, the accused would no longer have represented the corporation, its directors, shareholders or officers. The facts of this case are to the contrary. We conclude that the accused represented Mrs. Zingg in the transfer of the business. Although it is difficult to isolate the precise date of termination, clearly by the time the accused began the dissolution proceeding, Mrs. Zingg had retained another business lawyer and the accused was no longer her lawyer.

As to the preparation and execution of the will for Mrs. Zingg, the record clearly supports the conclusions of the Trial Board and Disciplinary Review Board that the accused's representation of Mrs. Zingg long since had terminated and that Mrs. Zingg had been so informed.

We conclude, as did the Trial Board and Disciplinary Review Board, that the accused was not representing Mrs. Zingg at the time of the initiation of the dissolution proceeding, but that he had formerly been her lawyer.

## 2. Matter Adverse to the Former Client.

In the circumstances of this case, there is no question but that the interests of the accused's client, Mr. Zingg, were adverse to Mrs. Zingg in the dissolution proceeding. *In re Jayne*, 295 Or 16, 663 P2d 405 (1983). Although evidence in this case relating to the issues in the dissolution proceeding is nearly non-existent, it is apparent that the assets of Mr. and Mrs. Zingg were divided between the spouses. Thus, the business that was established when the accused represented both his present and former clients necessarily was a focal point of the dissolution proceeding, with the attendant re-alignment of ownership, debt responsibility, and other financial interests. We conclude that the dissolution proceeding created an adverse relationship between the present client and former client of the accused.

## 3. Significantly Related Matter.

The resolution of this case turns on the relationship between the dissolution proceeding and the matters in which the accused formerly had represented Mrs. Zingg.

The courts have used various adjectives to describe when representations in two or more matters are sufficiently interrelated to give rise to a conflict. These descriptions typically arise in corporate litigation, in the context of motions to disqualify lawyers. *See* Hilliker, *Attorney Disqualification Motions,* 26 Prac Law 11 (Oct 15, 1980). The most common formulations employ the "substantial relationship" test, first articulated in *T. C. & Theatre Corp. v. Warner Bros. Pictures,* 113 F Supp 265, 268 (SDNY 1953):

> "[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client."

The federal courts differ in their interpretations of what relations are "substantial." Most federal courts look for a similarity or relationship between the subject matters or factual contexts of the former and current representations. *E.g., Trone v. Smith,* 621 F2d 994, 998 (9th Cir 1980). The Second Circuit, however, requires that the *issues* involved in

the representations be "identical" or "essentially the same." *Government of India v. Cook Industries,* 569 F2d 737, 740 (2d Cir 1978); *see generally* Note, *Developments in the Law: Conflicts of Interest in the Legal Profession,* 94 Harv L Rev 1244, 1315-34 (1981).

While we have held that a subsequent representation violates DR 5-105 if it involves a matter that was part of the former representation, *In re Mumford,* 285 Or 559, 591 P2d 1377 (1979), we have not used the term "substantial" to define the prohibited relationship between the two matters. Yet a survey of our cases reveals that where we have found a conflict, the former representation was more than incidentally implicated in the subsequent one. For example, in *In re Mumford, supra,* the accused represented a client in the subsequent representation who was suing a former client to enforce a divorce settlement which the accused himself had drafted. *In re Holmes,* 290 Or 173, 619 P2d 1284 (1980) involved a lawyer who represented a client in her attempts to settle some debts with a creditor, and later represented the creditor in a suit against the original client for a claim involved in the original settlement. In *In re Thorp, supra,* the accused represented a client in drafting a contract, then later represented a party in an action against the former client on that same contract. *See also In re Banks, supra; In re Brownstein,* 288 Or 83, 602 P2d 655 (1980) (finding conflict where lawyer for closely held corporation represents shareholder against dominant director).

■ These cases involved such egregious conflicts that we could decide them without searching for the boundary between the acceptable and unacceptable that closer cases such as this require us to locate. Adjectives such as "substantial" and "patent" do not help in this search. We prefer an approach that will provide the Bar and its members with more guidance. From our prior cases we can infer that the principle embodied in the concept of "significantly related" matters consists of two sub-tests:

  a. *Matter Specific.*

  Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in any matter in which the lawyer previously represented the former client; *or*

### b. *Information Specific.*

Representation of the former client provided the lawyer with confidential information the use of which would, or would likely, inflict injury or damage upon the former client in the subsequent matter.

The first rule is keyed to a particular matter, while the second is based on particular information. In many instances a single impropriety will violate both these rules. For example, assume that a lawyer represents an employee in drafting an employment contract. In the course of the representation, the lawyer consults with his client and learns that the client has a history of alcohol abuse. Later the lawyer ceases to represent the employee and is retained by the employer. The former client's alcohol abuse resurfaces and the employer hires the lawyer to assist in terminating the employment. The lawyer, in representing the employer, violates both rules: representation of the employer in the action would, or would likely, damage the former client-employee in the matter of the employment contract; and the former client-employee in the subsequent matter, would, or would likely, be damaged due to the lawyer's possession of confidential information obtained in the earlier representation.

In other situations a lawyer may violate one rule without violating the other. For example, a client retains the lawyer to draw up an employment contract. They have a single meeting, at which the client, the lawyer, the client's employer, and the employer's lawyer are present, and the contract is signed. No confidential information is obtained from the client. Later, the lawyer ceases to represent the employee and is retained by the employer, who now wants to terminate the employment. The lawyer, in representing the employer, violates the first rule but not the second. Representation of the employer in the termination would, or would likely, damage the former client in the matter of the employment contract, but because there was no confidential information obtained by the lawyer, there is no such information the use of which would, or would likely, damage the former client in the subsequent matter. But the representation is a violation nonetheless, because it is contrary to the first rule. In retaining a lawyer to perform a task, a client must be able to rely on the fact that a future client of the lawyer will never to able to

gain from the lawyer's own lack of diligence or care in the former representation.

Again, assume that a client retains a lawyer to draft an employment contract. During consultation, the lawyer learns that the client has a drinking problem. The employment contract is executed, the client is happily employed, and remains a productive employee. Meanwhile, the lawyer ceases to represent the client and is retained by the client's ex-wife, who wants to acquire custody of the children who are living with their father. In accepting this subsequent representation, the lawyer violates the second rule but not the first. It cannot be said that the present representation in the custody matter would, or would likely, damage the former client in the employment contract matter; but any use of the confidential information obtained as a result of the employment contract matter would, or would likely, damage the former client in the custody matter. There is no hint that in drawing up the employment contract the lawyer might not have used all possible diligence and care. However, the confidential information acquired in the apparently unrelated employment contract matter gives the lawyer's present client an unfair advantage in the subsequent matter.

This two-part sub-test serves the purpose behind the proscription of subsequent representation adverse to former clients. It protects client confidences from intentional or inadvertent disclosure and promotes the virtue of loyalty. *See* Legal Background to Rule 1.9, ABA Model Rules of Professional Conduct.

Having earlier determined that the first two factors are present, we now examine the facts of this case relative to our two-part test to determine whether the dissolution proceeding and the matters in which the accused formerly represented Mrs. Zingg were "significantly related."

### a. Preparation and Execution of Will.

We can easily imagine situations in which the lawyer who drafted a former client's will would be barred from representing that former client's spouse in a dissolution proceeding. The confidential information acquired in the preparation of the will could include intimate details of the person's financial background, history, and holdings that

would, or would likely, give the lawyer's present client an unfair advantage in the subsequent dissolution proceeding, damage the former client's financial interests, create the impression of unfairness, and leave the former client with a legitimate feeling of betrayal.

There is nothing in the record in this case, however, that suggests that the accused obtained any confidential information in the will preparation and execution matter that would, or would likely, work to the detriment of Mrs. Zingg in the dissolution proceeding. Further, the later execution by the former client of a new will, "superseding" the will prepared by the accused, convinces us that there is no matter specific or residual transactional conflict.

### b. Organization of Business.

The representation of the former client in the organization of the business involved a simple purchase, not unlike the purchase of a house financed by mortgage or trust deed. However, the accused's representation of Mrs. Zingg in the course of that transaction and continuing thereafter was more than merely incidental to his representation of her husband. The restraining order, requested by the accused and filed in the dissolution proceeding, effectively barred his former client from participating in the very business which the accused was instrumental in setting up, in part for the benefit of the former client. Had the representation of the parties been reversed, that is, the accused represented Mrs. Zingg and obtained a restraining order preventing Mr. Zingg's participation in the business, the transactional conflict would be clear. Here, the matter specific conflict is not so apparent, but, nevertheless, exists.

Whether the new proceeding is significantly related to the accused's representation of his former client in the business transaction, apart from the restraining order, is a difficult question. There is a high potential for infliction of injury or damage to any former client in a dissolution proceeding involving any matter in which the accused previously represented the former client (establishment of a business, purchase of property, preparation of an *inter vivos* irrevocable trust, adoption, workers' compensation claim or a myriad of other matters).

## DISPOSITION

■ On the facts of this case, we conclude, based upon clear and convincing evidence, that the accused's representation of Mr. Zingg in the dissolution proceeding would, or would likely, inflict injury or damage upon Mrs. Zingg in relation to a specific matter, the business in which the accused previously represented Mrs. Zingg. On the other hand, we do not conclude that the accused's previous representation of Mrs. Zingg provided the accused with any confidential information that would, or would likely, inflict injury or damage upon Mrs. Zingg in the dissolution proceeding.

The parties in this case raised two procedural issues. The accused argued that he should have been permitted to compel the testimony by deposition of a local lawyer regarding his representation of Mrs. Zingg and a psychiatrist regarding his treatment of her. Assuming that the Trial Board's refusal to require the depositions was incorrect, we fail to see any resulting prejudice to the accused. Based upon the accused's own testimony, we concluded that the accused had represented the former client; but we also concluded that the lawyer-client relationship had terminated before the conflict arose. We understand the thrust of the accused's claim of error in not compelling the psychiatrist to testify to be the loss of potential evidence of Mrs. Zingg's credibility. It was the accused's own recounting of the facts of this case, together with the admitted exhibits, upon which we based our factual determination.

The Bar objects to the Trial Board's decision to allow local lawyers to testify as expert witnesses offering their respective opinions of the accused's conduct. Although we have some misgivings about this procedure, because the Bar did not object to the receipt of the testimony until after the hearing and because of the outcome of this case, we do not reach this issue.

Having found a conflict of interest in the representation of the present client by the accused against his former client, we conclude that the accused should be issued a reprimand. This opinion will serve as the reprimand.

Costs to the Oregon State Bar.