Argued and submitted November 6, 1984, accused not guilty September 17, 1985

In re Complaint as to the Conduct of

# REES C. JOHNSON,
*Accused.*

(81-83; SC S30430)

707 P2d 573

Thomas E. Cooney, Portland, argued the cause for the accused. With him on the brief was Cooney, Crew & Wihtol, Portland.

Lawrence Wobbrock, Portland, argued the cause for the Oregon State Bar. With him on the brief were Dana R. Taylor and George A. Riemer, Portland.

PER CURIAM

## PER CURIAM

Upon the complaint of Gerald Smith (Smith), a former client, the accused was charged by the Oregon State Bar with conflicts of interest and assisting his client in illegal or fraudulent conduct. The amended complaint listed five charges in three causes of complaint. The first cause related to transactions between Tri-Chem Corporation (Tri-Chem) and Merchants Building Maintenance, Inc. (Merchants) in 1978. The Bar alleged that the accused violated DR 5-105:[1] (1) by representing both the buyer and seller in a land sale contract; and (2) by representing Victor King (King), Smith, Tri-Chem and Merchants in connection with the sale and transfer of stock. The second cause related to the land sale contract between the two corporations. The amended complaint alleged that the accused violated DR 7-102(A)(7) and DR 7-102(B)(1):[2] (1) by "preparing, notarizing and filing" a real estate contract signed by King as president of Tri-Chem when the accused knew or should have known that King was not the

---

[1] DR 5-105 of the Code of Professional Responsibility provides, in pertinent part:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

[2] DR 7-102 provides, in pertinent part:

"(A) In his representation of a client, a lawyer shall not:

"* * * * *

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

"(B) A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of the representation perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal, except when the information is protected as a privileged communication."

president of Tri-Chem; and (2) by failing to inform Smith and Tri-Chem of the land sale contract when the accused knew or should have known that Smith was the president of Tri-Chem. The third cause involved unrelated litigation in which Smith and King were defendants. *See In re Shannon,* 297 Or 168, 681 P2d 794 (1984). The Bar alleged that the accused violated DR 5-105 by representing both Smith and King when the clients' interests were adverse or potentially adverse without obtaining the clients' consent to such representation after full disclosure of the adverse or potentially adverse interests and the conflict of interest for the accused in representing both men. The accused denied all the charges.

The Trial Board found[3] the accused guilty of the first charge in the first cause but not guilty of any other charge and recommended a public reprimand. The Disciplinary Review Board found the accused not guilty of any charge. The Bar sought review by this court of that decision pursuant to ORS 9.536.

Because the complaint in this case was filed in 1982, we review pursuant to Rule 48 of the Oregon State Bar Rules of Procedure Relative to Admission, Discipline, Resignation and Reinstatement in effect at that time. Bar Rule 1.5. This court makes an independent review of the evidence to determine whether the presumption of the accused's innocence has been overcome by clear and convincing proof that a violation of a disciplinary rule has occurred. *In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1982). "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Supove et al v. Densmoor et ux,* 225 Or 365, 372, 358 P2d 510 (1961).

We find the following to be the pertinent facts. The accused represented Smith and King as clients for several years prior to the incidents leading to these charges. Smith and King had conducted business together in the purchase, operation, and sale of janitorial accounts in California and Oregon since 1960. Both men owned and presided over several different business enterprises, including the corporations Tri-

---

[3] The Trial Board in its written opinion combined its findings of fact with its conclusions of law. Although we review the matter *de novo* (ORS 9.536(3)), it would be more helpful to this court if the findings of fact were separately stated before the conclusions were set forth.

Chem and Merchants. At varying dates, Smith or King held different ownership interests and corporate positions in these two corporations. Both men actually operated much as a partnership, dividing the profits of numerous enterprises, without much regard for their status in any one of the enterprises at a given date. With Smith's approval, King was the up-front man, who made contact with people, including the lawyers, for the enterprises. Smith was the organization man, who stayed behind the scenes and insured that their enterprises operated efficiently. Ordinarily, the accused dealt with King, and not with Smith. Although the accused occasionally made attempts to involve Smith directly in the legal activities of the corporations, Smith generally declined to participate. Ordinarily, Smith and King would reach their agreements in private, and King would inform the accused or members of the accused's firm of the business decisions and what documents were required. Neither Smith nor King took the accused or members of the accused's firm into their confidence as to the inner workings of the businesses.

The accused represented Tri-Chem and Merchants. He had filed the articles of incorporation for both corporations. Tri-Chem was originally incorporated to market a cleansing solution. King initially owned 85 percent of the stock, and a third party owned 15 percent of the stock and was president. In November 1976, Smith was "appointed" president of Tri-Chem, but King retained 85 percent of the stock. A document attesting the appointment, dated December 12, 1976, was found in the files of the accused's law firm. On November 28, 1976, Tri-Chem purchased some real property, which property is the financial focal point of the several charges, with a residence for King situated thereon. Smith signed as president of Tri-Chem, the buyer. The real property, known as the Eagle Creek property, was Tri-Chem's sole asset.

Merchants operated a janitorial service. Smith had been president and sole shareholder in Merchants, but in August 1977, he sold his stock to King. King became president of Merchants at that time.

In May of 1978, the accused, at the request of King, prepared new stock certificates showing ownership of 100 shares of stock in Tri-Chem in the name of Smith. The

accused was not informed whether the stock transfer had been accomplished. Also in May of 1978, Smith left a telephone message at the office of the accused requesting preparation of a lease option for the Eagle Creek property from Tri-Chem to King, which document was prepared. The accused never was informed whether the document was executed. On October 13, 1978, upon the instruction of King, the accused prepared a contract of sale which contracted to convey the Eagle Creek property from Tri-Chem to Merchants. King informed the accused that he, King, was then the president of both Tri-Chem and Merchants. King signed the contract as president of each corporation, and the accused took his acknowledgment. The accused caused the contract to be recorded. The accused represented King, Tri-Chem and Merchants as clients in this transaction. The accused did not know that King was not the president of Tri-Chem on October 13, 1978. It was common for Smith and King to change the ownership and officers in various corporations without informing the accused.

A document found in the accused's law firm's files indicates that on November 6, 1978, the accused wrote Smith enclosing the original corporate records of Tri-Chem and informing Smith that the accused could no longer represent him due to a possible conflict of interest. The October 13, 1978, contract of sale was not included among the enclosures.

## FIRST CAUSE OF COMPLAINT

The first charge of the first cause of complaint alleged that the accused represented King, Smith, Tri-Chem and Merchants until November 1978, and that Smith and King had interests in Tri-Chem and Merchants which were adverse or potentially adverse in respect of the October 13, 1978, land sale transaction. This conduct was alleged to have been unethical and in violation of DR 5-105, which provides, in pertinent part:

"(B) A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

Since its adoption by this court in 1970, DR 5-105 has undergone a judicially-crafted metamorphosis. For instance,

one aspect of this rule that is not readily apparent from the precise wording of the rule is the concept of "conflicts of interest." The rule is couched in terms of the effect upon the exercise of the lawyer's independent judgment but has been interpreted to concern conflicts of interest which, in turn, in this rule, are measured by the conflict[4] between the interests of two or more existing clients (a so-called "open file" conflict). *See In re Brandsness,* 299 Or 420, 423, 702 P2d 1098 (1985); *In re Thorp,* 296 Or 666, 677, 679 P2d 857 (1984), and *In re Banks,* 283 Or 459, 476-77, 584 P2d 284 (1978).

■       Further, disciplinary opinions of this court have developed levels of conflicting interests of clients, to which different requirements upon the lawyer apply. The actual, likely or unlikely conflict of interest between two clients determines the appropriate action by the lawyer:

■       1.   Actual Conflict. For some years, this court has recognized a distinction between an actual conflict and a potential conflict. In the case of *In re Porter,* 283 Or 517, 523, 584 P2d 744 (1978), drawing upon the language of DR 5-105, we observed that:

> "* * * if the representation of multiple clients is such that the lawyer's *independent professional judgment* on behalf of one client *will be* adversely affected (an 'actual conflict'), or *is likely to be* adversely affected (a 'potential' conflict), the representation is improper unless the exception provided in DR 5-105(C) applies." (Emphasis in original.)

Thereafter, in the case of *In re Jans,* 295 Or 289, 666 P2d 830 (1983), we interpreted DR 5-105 flatly to prohibit the representation of multiple clients who have an actual, as opposed to a potential conflict. We said: "It is never proper for a lawyer to represent clients with conflicting interests no matter how carefully and thoroughly the lawyer discloses the possible effect and obtains consent." *In re Jans, supra,* 295 Or at 295.

Thus, when the interests of two or more present clients of the lawyer are in actual conflict, the lawyer cannot

---

[4] Quoting Ethical Consideration 5-14 of the Code of Professional Responsibility, we previously have noted that the adverse affect upon the lawyer's independent judgment arises when two or more clients may have differing interests, "whether such interests be conflicting, inconsistent, diverse, or otherwise discordant." *In re Porter,* 283 Or 517, 522, 584 P2d 744 (1978).

ethically represent the multiple clients or any of them. Further, the determination, disclosure and consent exception (DR 5-105(C)) is not available to permit the multiple representation.

■     2.   Likely Conflict. Since our decision in *Porter,* we have referred to conflicts as being either "actual" or "potential." We now deem the word "potential" to be overly broad and to depart from the precise words of the test of the disciplinary rule. Henceforth, we shall refer to this second level of conflict in the terms used by DR 5-105. Where the lawyer's independent professional judgment only is likely to be adversely affected, the lawyer may represent multiple clients if, and only if, he or she complies with the requirements of DR 5-105(C).[5]

■     3.   Unlikely Conflict. Although not directly discussed in our previous opinions, the language of the rule effectively creates a third level of conflicting interests of clients, and that is found in those circumstances in which the lawyer's independent judgment is "unlikely" to be adversely affected.[6] In this category of representation of multiple cli-

---

[5] In our opinion in *In re Porter, supra,* 283 Or at 528-29 n 5, we noted the apparent initial requirement for application of DR 5-105(C) that it be "obvious that [the lawyer] can adequately represent the interest of each [client]." The footnote states:

"This is troubling language. The Bar contends that DR 5-105(C) states a two-part test. The issue of consent after full disclosure is not even reached until the initial requirement that 'it is obvious that he [the lawyer] can adequately represent the interest of each' is satisfied. The Bar argues that this requirement embodies the policy that differing interests may be represented only in rare cases. The following ethics opinions provide support for the Bar's position by treating the requirement that adequate representation be obvious as a separate standard: Opinions of the Committee on Legal Ethics of the Oregon State Bar numbers 218 and 376; ABA Formal Opinion number 331 (12/15/72); ABA Informal Opinions numbers 1235 (8/24/72) and 1282 (11/21/73).

"To read the language of DR 5-105(C) literally, however, would make the representation of conflicting interests nearly impossible. The difficulty lies in the word 'obvious.' Once it is shown that the exercise of the lawyer's independent professional judgment would be or would likely be adversely affected (DR 5-105(A)), how could it ever be *'obvious'* that he could adequately represent the interest of each party?

"In this regard it is worth noting that New Jersey, in enacting DR 5-105(C), modified the wording to permit the representation 'if he [the lawyer] *believes* that he can adequately represent the interests of each and if each consents to the representation after full disclosure * * *.' (Emphasis added)"

[6] A fourth level is suggested in the representation of multiple clients and that might be termed the "impossibility" of adverse effect upon the lawyer's independent

ents, a lawyer ethically may represent two or more clients without being required to comply with the DR 5-105(C) determination, disclosure and consent requirement.

■ ■ Because DR 5-105 speaks both to undertaking employment (DR 5-105(A)) and to continuing employment (DR 5-105(B)), we note the obvious: the relationship between the lawyer and multiple clients is subject to change. That is, changing circumstances may move the relationship from one level to another, requiring further action by the lawyer to avoid the pitfalls proscribed by this rule. A second obvious factor is that the lawyer's decision in respect of a conflict of interest is subject to review, should a disciplinary complaint be made, by the disciplinary review adjudicators and this court.

After digesting the foregoing analysis of DR 5-105, it necessarily should occur to practicing lawyers that the simultaneous representation of multiple clients is fraught with professional danger. Two years ago, in *In re Boyer,* 295 Or 624, 629, 669 P2d 326 (1983), we noted the numerous cases in recent years involving conflicts of interest, with resulting sanctions stretching from reprimand to disbarment. One writer suggests the following as a practical way to avoid such problems:

> "* * * If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or with a former client, or a conflict between the interests of any client and that of the attorney, or may require the use of information obtained through the service of another client, the employment should be refused."

Wise, Legal Ethics 273 (2d ed 1970), quoted with approval in *In re Banks, supra,* 283 Or at 476, and *In re Hershberger,* 288 Or 559, 567, 606 P2d 623 (1980).

■ Before applying the law to the facts of this case, we examine one further aspect of DR 5-105. That aspect is the standard or degree of culpability to which a lawyer will be held

---

judgment. Although theoretically possible, it is doubtful that a lawyer, with any degree of certainty, could conclude that the representation of multiple clients never would affect his or her independent judgment. Consequently, we do not pursue this category further, only noting that the third category (unlikely conflict) will suffice to offer sufficient guidance.

in conflict-of-interest cases. First, because DR 5-105 is written in terms of affecting the independent judgment of the lawyer, the lawyer must have available some factual predicate suggesting a conflict of interest before he or she will be held accountable for a violation of DR 5-105. From this conclusion evolves a two-step test:

1. Knowledge of Facts. Knowledge on the part of the lawyer of predicate facts, established by admission or stipulation, or as found by the trier of fact, must be adduced disclosing an actual or likely conflict of interest. We further conclude that knowledge of the predicate facts may be imputed to the lawyer if, by the exercise of reasonable care, such predicate facts should have been known by the lawyer. *Cf. In re Lathen,* 294 Or 157, 168, 654 P2d 1110 (1982). What facts the lawyer knew, or by the exercise of reasonable care, should have known, must be established by clear and convincing proof. *In re Adams,* 293 Or 727, 652 P2d 787 (1982). This degree of proof means that the truth of the facts asserted is highly probable. *Supove et al v. Densmoor et ux, supra,* 225 Or at 372.

2. Determination of Conflict. Given the predicate facts as admitted, stipulated or found, the adjudicators must then determine whether there was a conflict of interest between the multiple clients. This part of the test is not hinged to the lawyer's recognition of the conflict of interest.

We now review the facts of this case in light of the foregoing discussion of the law. This court has stated that in respect of the representation of the buyer and seller in a land sale contract such representation is unethical when the lawyer is "attempting to represent both buyer and seller, who have, by the very nature of the transaction, conflicting interests." *In re Barnett,* 269 Or 264, 265, 524 P2d 1208 (1974) (quoting Oregon State Bar Ethics Opinion No. 162 (1969)).[7] However, we believe that when it is not apparent from "the very nature of the transaction" that an actual or likely conflict exists, a lawyer's representation of multiple clients in a land sale transaction is not necessarily "one of the clearest cases of the improper representation of conflicting interests" as we stated

---

[7] The identical quote appears also in Oregon State Bar Ethics Opinion No. 272 (1974).

in *In re Boivin,* 271 Or 419, 425, 533 P2d 171 (1975). Thus, if a transaction does not reveal the actual or likely conflict of interest, the statements quoted from *Barnett* and *Boivin* are inapposite. That is the situation in the instant case.

■ Applying the two-part test described above to the facts set forth earlier in this opinion, in consonance with the Disciplinary Review Board, we do not conclude that the accused knew, or by the exercise of reasonable care should have known, facts establishing an actual or likely conflict of interest in the land sale transaction. We repeat that the Trial Board concluded to the contrary, and we acknowledge that it is a very close question.

In order to determine the fact that Smith was president and majority shareholder of Tri-Chem on October 13, 1978, the accused would have had to doubt the veracity of his client, King, who signed the October 13, 1978, land sale contract as president of Tri-Chem and informed the accused that he was the president of Tri-Chem. In light of the pattern of representation of the interests of King and Smith through contact with King alone, and the common occurrence of corporate changes made by King and Smith without informing the accused, we are not convinced that the accused knew, or by the exercise of reasonable care should have known of an actual or likely conflict between Smith and King. The Bar has not established by clear and convincing evidence a violation of DR 5-105(B) by the accused as charged in the first charge of the first cause of complaint.

The Bar's petition to this court was limited to the first charge of the first cause, as was the accused's response. For that reason, we need not examine the other charges. *See In re Galton,* 289 Or 565, 568, 615 P2d 317 (1980). Nevertheless, we have examined the facts relative to the other charges in this case and concur with the findings of the Trial Board and Disciplinary Review Board that the accused is not guilty of any of these charges.

The second charge of the first cause alleges that the accused violated DR 5-105 in representing King, Smith, Tri-Chem and Merchants in connection with the transfer of stock. The evidence in the record is insufficient to establish a violation by clear and convincing evidence.

## SECOND CAUSE OF COMPLAINT

The second cause of complaint alleges that in respect of the October 13, 1978, land sale transaction the accused violated DR 7-102(A)(7) and DR 7-102(B)(1). These rules make it unethical for a lawyer to "[c]ounsel or assist [a] client in conduct that the lawyer knows to be illegal or fraudulent," DR 7-102(A)(7), and to fail to take action to rectify the situation when the lawyer "receives information clearly establishing that * * * [the] client has, in the course of the representation perpetrated a fraud upon a person." DR 7-102(B)(1). In the terms of these rules, it is clear that the accused's alleged guilt in the second cause of complaint has not been proven by clear and convincing evidence.

## THIRD CAUSE OF COMPLAINT

The third cause of complaint was withdrawn by the Bar prior to the hearing before the Trial Board.

The accused is not guilty of ethical misconduct. Pursuant to ORS 9.536(4), we award the accused his actual and necessary costs and disbursements incurred against the Bar.