Argued and submitted March 7; reassigned August 22, complaint of the Oregon State Bar dismissed August 25, 1994

In re Complaint as to the Conduct of
ROBERT W. McMENAMIN,
*Accused.*

(OSB 90-86; SC S40621)
879 P2d 173

Mary A. Cooper, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed the briefs.

Marvin S. Nepom, Portland, argued the cause and filed a response for the accused.

PER CURIAM

Fadeley, J., concurred and filed an opinion.

Graber, J., filed a dissenting opinion in which Carson, C. J., and Gillette, J., joined.

## PER CURIAM

This is a lawyer disciplinary proceeding. The Oregon State Bar (Bar) charges that the accused had a conflict of interest in violation of DR 5-105(C) (1989).[1] A trial panel of the Disciplinary Board found the accused not guilty. The Bar sought review by this court pursuant to BR 10.1, BR 10.3, and ORS 9.536(1). We review the record *de novo*. ORS 9.536(3). The Bar has the burden of establishing ethical misconduct by clear and convincing evidence. BR 5.2. Because we conclude that the Bar has not established ethical misconduct by clear and convincing evidence, we adopt the decision of the trial panel. BR 10.6.[2] The Bar's complaint is dismissed. Costs and disbursements to the accused. ORS 9.536(4).

**FADELEY, J.,** concurring.

On *de novo* review, I find, as did the trial panel, that the accused lawyer has not been proved guilty of a conflict-of-interest violation by evidence that is both clear and convincing. That level is not achieved here, in my opinion, for the following three reasons.

## I. ADVICE OF EXPERT COUNSEL

When a new client sought the accused's services to sue a former client, the accused recognized that a potential conflict question was present. He contacted the Bar's experts on the disciplinary rules and ethical practices and asked them about taking the new client's case. They gave him the green light, that no prohibited conflict was present. That position of the Bar is entitled to some weight in the scales of justice used

---

[1] DR 5-105(C) (1989) provided:

"[A] lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict."

That version of the rule did not define the term "significantly related."

[2] BR 10.6 provides:

"The court shall consider each matter de novo upon the record and may adopt, modify or reject the decision of the trial panel or the [Board of Bar Examiners] in whole or in part and thereupon enter an appropriate order. If the court's order adopts the decision of the trial panel or the [Board of Bar Examiners] without opinion, the opinion of the trial panel or the [Board of Bar Examiners] shall stand as a statement of the decision of the court in the matter but not as the opinion of the court."

to determine whether the evidence of the Bar to the contrary of its former position is convincing.

## II. CONTRADICTIONS IN THE PROOF

The Bar's case for an information-specific conflict rests on an inference to be drawn from certain testimony of the accused before the trial panel that, taken by itself, seems an admission against the accused's interest. But it does not stand by itself in the accused's testimony. Other, and more frequent, answers given on the same point do not support drawing the inference. Unless I am to believe that the accused was credible in only one of his answers on the point, I cannot disregard the totality of his answers to draw an inference that they do not warrant. At best, taken in context rather than in isolation, the answer is ambiguous. Accepting the accused as credible, as did the trial panel, the inference fails for lack of a sufficiently clear or convincing foundation.

## III. FAILURE TO PRODUCE MORE SATISFACTORY EVIDENCE

A statute embodying a long-held belief about the reliability of weaker evidence where stronger evidence is available applies in this case. ORS 10.095(7) and (8) tell me, as a factfinder, to view with "distrust" that weaker evidence.

The Bar produced the weaker evidence of the accused's answer that was clearly against his interest only if taken in isolation from the rest of his testimony. That answer involved the contents of an earlier conversation with the executive head of his former client. Stronger and more satisfactory evidence perhaps could have been produced, if the contents of that conversation was as the Bar contends, by producing that executive as a witness to recount the conversation and display any notes that he might have made about it. But the Bar, which bears the burden to persuade convincingly, failed to produce or explain the absence of that witness. The ambiguous evidence must be viewed in the light of the statute and the absent, potentially stronger, evidence. In that light, the Bar's evidence fails to convince. The accused has not been proved guilty of the disciplinary charge and is, therefore, not guilty.

I concur in that finding.

**GRABER, J.,** dissenting.

In a bland and conclusory manner, the majority papers over an obvious conflict of interest, the most conspicuous feature of which will be detailed in the discussion below. The majority's result undermines the faith that clients can have in the protection of confidences entrusted to their lawyers. I therefore dissent.

## PROCEDURAL BACKGROUND

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charges that the accused had a conflict of interest in violation of DR 5-105(C) (1989). In part, that disciplinary rule provided:

"[A] lawyer who has represented a client in a matter shall not subsequently represent another client in * * * a significantly related matter when the interests of the current and former clients are in actual or likely conflict."[1]

A trial panel of the Disciplinary Board found the accused not guilty. The Bar sought review by this court pursuant to BR 10.1, BR 10.3, and ORS 9.536(1). This court reviews the record *de novo*. ORS 9.536(3). The Bar has the burden of establishing ethical misconduct by clear and convincing evidence. BR 5.2.

## FACTS

In stating the facts below, I rely almost entirely on uncontradicted testimony of the accused and on other admissions by him, including the pleadings and stipulations of fact. It is hard to understand how the majority can fail to find facts by clear and convincing evidence when they are based on what the accused himself said.

---

[1] DR 5-105(C)(2) now provides:

"[A] lawyer who has represented a client in a matter shall not subsequently represent another client in * * * a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if * * *:

"* * * * *

"(2) Representation of the former client provided the lawyer with confidences or secrets, as defined in DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter."

The accused represented the Archdiocese of Portland for several years, including the period 1983 through 1988. During the early years of that representation, Archbishop Power was Archbishop of the Archdiocese; in September 1986, Archbishop Levada succeeded Archbishop Power. The representation by the accused covered many legal matters, including clergy sexual abuse, employment relations, and other issues pertaining to the operation of the Archdiocese. In his own words, the accused "was acting as corporate counsel for the Archdiocese" during the period 1983 through 1988.

During his representation of the Archdiocese, including the years 1983 through 1988, the accused advised the Archdiocese regarding responses to allegations of clergy sexual abuse. For example, on October 3, 1985, he advised a representative of the Archdiocese on how to handle rumors or claims of sexual misconduct by clergy.

In 1983, at the request of and on behalf of the Archdiocese, the accused undertook an investigation of actual and potential claims against the Archdiocese of Portland arising from the conduct of Father Laughlin, who was convicted of numerous counts of sexual abuse involving children. A partner of the accused represented Father Laughlin in the criminal matter. The accused assisted the Archdiocese in reaching confidential settlements in several civil claims involving Father Laughlin and in negotiating with the Archdiocese's insurance carriers regarding coverage of those claims.

After the Laughlin matter had been concluded, the accused again advised the Archbishop and other representatives of the Archdiocese on how to respond to claims involving clergy sexual abuse. In doing so, the accused became familiar with the attitude of each of the two Archbishops toward matters involving clergy sexual abuse. For example, the accused knew that the Archdiocese had failed to follow his legal advice in at least one respect; when the accused advised Archbishop Levada to hold "a seminar regarding clergy sexual misconduct," the Archbishop declined on the ground that "he had other things or more important things to talk to his priests about."

The accused testified as follows:

"Q. Did you advise the Archbishop Levada to put on a seminar regarding clergy sexual misconduct?

"A. Yes.

"Q. Did he take your advice?

"A. No.

"Q. Do you know why he didn't take your advice?

"A. He indicated to me in a conversation that he had other things or more important things to talk to his priests about."

Further, when questioned about a letter containing a list of items discussed with Archbishop Levada, the accused testified:

"Q. Did you recommend a seminar to Archbishop Levada on clergy sexual abuse?

"A. I believe that I did. It's not in this letter.

"Q. Do you recall if you recommended such a seminar a number of times to Archbishop Levada?

"A. I can specifically recall the meeting in November of — I think it was November of '88. But there was this one time I know that I made some notes from his direct conversation when he said he had more important things for his priests to do. That's one time I recall when I suggested it."[2]

After June 8, 1988, the accused received no new legal matters to handle on behalf of the Archdiocese. All of the accused's work for the Archdiocese was completed by January 1989.

In late April 1989, the accused met for the first time with an individual named Brown. Brown contacted the accused after reading an article about the accused's work with the Archdiocese in investigating sexual abuse by priests. Brown told the accused that he had been sexually abused by Father Goodrich, a priest in the Archdiocese of Portland, from 1974 to approximately August of 1988. Father Laughlin and Father Goodrich had the same supervisors, including the Archbishop of Portland.

---

[2] The accused also gave additional, more general advice. He did not, however, retract the testimony, quoted above, as to his specific recollection of what Archbishop Levada told him in response to his advice to hold a seminar regarding clergy sexual misconduct.

Shortly after meeting with Brown, the accused made a demand on the Archdiocese for damages allegedly suffered by Brown. The Archdiocese, through its new counsel, took the position that the accused had a conflict of interest, and it refused to negotiate with him. The accused filed a complaint against the Archdiocese on Brown's behalf, in Multnomah County Circuit Court, on September 12, 1989. The complaint alleged, among other things, that Father Goodrich had sexually abused Brown from 1974 to approximately August of 1988 and that the Archdiocese knew or should have known of Father Goodrich's inappropriate conduct but failed to supervise him adequately. In addition to seeking compensatory damages, the Brown complaint sought punitive damages against the Archdiocese; among other grounds, the complaint alleged that the Archdiocese knowingly failed to supervise Father Goodrich, knowingly failed to report abuse to Children's Services Division as required by ORS 418.750, and obstructed the investigation of Brown's claim.

The Archdiocese moved to disqualify the accused from representing Brown, on the ground that he had a conflict of interest relating to clergy sexual abuse claims against the Archdiocese covering the period 1983 through 1988. The circuit court held a lengthy hearing on the matter, during which it took testimony of nine witnesses. The court then granted the motion and disqualified the accused and his law firm from further involvement in the Brown case, based on equitable grounds rather than on the ground of a violation of a disciplinary rule. The Bar then initiated the present proceeding.

## CONFLICT OF INTEREST

A. *Applicable Standard for Information-Specific, Closed-File Conflict.*

In *In re Brandsness*, 299 Or 420, 702 P2d 1098 (1985), this court considered the then-existing version of DR 5-105 and its application to conflicts generated by a lawyer's representation of a present client against a former client. This court held:

"A 'closed file' conflict arises when a lawyer represents a client who is in a position adverse to a former client in a matter that is significantly related to a matter in which the

lawyer represented the former client. Thus, a three-factor test can be used to determine if a conflict exists. When the following factors co-exist, a conflict results:

"1. The adverse party is one with whom the accused had a lawyer-client relationship;

"2. The representation of the present client puts the accused in a position adverse to the former client; and

"3. The present matter is significantly related to a matter in which the accused represented the former client." 299 Or at 426-27 (footnote omitted).

The text of DR 5-105(C) (1989), quoted at the beginning of this opinion, contained those same three criteria. *See In re McKee*, 316 Or 114, 129, 849 P2d 509 (1993) (court analyzed whether the accused had violated an earlier version of DR 5-105(C) and stated that "[t]he new rules codified this court's holding in *In re Brandsness*"); *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 140, 145-47, 843 P2d 442 (1992) (court tracked methodology used in discipline cases under DR 5-105; although applying the version of that rule in effect in 1981-83, court observed that DR 5-105 "since has been amended, but its effect essentially is the same," *id.* at 140 n 7, and that "changes in DR 5-105 reflect an evolution of terminology rather than substance," *id.* at 145 n 13). I therefore examine each of the three criteria listed in *In re Brandsness*.

B. *Application of Standard to This Case.*

It is not disputed that the first two *Brandsness* criteria were satisfied here. The accused formerly represented the Archdiocese, and he later represented Brown in a matter adverse to the Archdiocese.

What is disputed in this case is the third criterion: whether the two matters were "significantly related" within the meaning of DR 5-105(C) (1989), so as to create an information-specific conflict. For matters to be "significantly related" within the meaning of that rule, two requirements must be met. First, representation of the former client provided the lawyer with confidences. *See In re Brandsness*, 299 Or at 432 (determining that the then-existing version of DR 5-105 incorporated that requirement). Second, as pertinent

here, those confidences "would likely[] inflict injury or damage" on the former client in the course of the later matter. *See id.* at 434 (same). I consider each of those two requirements in turn.

As noted, the first requirement of DR 5-105(C) (1989) for "significantly related" matters is that representation of the former client provided the lawyer with confidences. "Confidences" are defined for the purposes of the disciplinary rules; DR 4-101(A) provides that a " '[c]onfidence' refers to information protected by the attorney-client privilege under applicable law." OEC 503(1)(b) is the "applicable law" that contains the attorney-client privilege and that is incorporated by reference in DR 4-101(A). OEC 503(1)(b) defines a confidential communication as one "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."

In this case, representation of the Archdiocese provided the accused with at least one kind of confidence within the meaning of that definition. The accused acquired information about the manner in which the Archdiocese responded to allegations of clergy sexual abuse from 1983 through 1988. As one specific example, the accused testified that he knew that Archbishop Levada had failed to follow his legal advice to hold "a seminar regarding clergy sexual misconduct," because the Archbishop felt that he had "more important things" to discuss with priests.

The accused does not contest that that information was confidential, and he does not contest that it was acquired by him as a result of his representation of the Archdiocese.[3] The first requirement of DR 5-105(C) (1989) for "significantly related" matters is satisfied.

The accused notes that the advice that he gave to the Archdiocese was the same type of advice that he had discussed publicly in many seminars and writings. The accused also

---

[3] The accused acknowledged that Archbishop Levada's attitude toward the advice that the accused gave concerning a seminar on clergy sexual misconduct was relayed to him in the capacity of lawyer to client.

states that the procedures of the Archdiocese concerning how to respond to various allegations of clergy sexual abuse were not confidential and that the Archdiocese had a policy of responding openly to such allegations. Those observations are beside the point.

The specific advice that a lawyer gives to an individual client is given in confidence even if it is consistent with the lawyer's public statements. More to the point in this case, *the individual client's privately revealed response to the lawyer's advice is a confidence* given from the client to the lawyer. In addition, the discussions between lawyer and client are confidential even if the client adopts a policy of openness regarding the subject matter of a claim or its claim-handling procedures, as distinct from revealing the content of the lawyer-client discussion itself.

The second requirement of DR 5-105(C) (1989) for "significantly related" matters, in the context of this case, is that the confidences provided to the lawyer by the former client "would likely[] inflict injury or damage" on the former client in the course of the later matter. The accused argues that the Bar has failed to prove that confidential information received through his representation of the Archdiocese would likely have injured the Archdiocese in the course of the Brown litigation. For the following reasons, I disagree.

As previously stated, the accused had confidential information about how the Archdiocese handled allegations of clergy sexual abuse from 1983 through 1988. Issues in the Brown litigation included what the Archdiocese knew or should have known about sexual abuse by its priests from 1974 through 1988, and what the Archdiocese did or should have done to prevent or curtail such conduct. Brown sought punitive damages, making the attitude of the defendant toward claims of clergy sexual abuse relevant. *See Honeywell v. Sterling Furniture Co.*, 310 Or 206, 210-11, 797 P2d 1019 (1990) (punitive damages are allowed to punish a willful, wanton, or malicious wrongdoer and to deter that wrongdoer and others from like conduct in the future; "the attitude" of the wrongdoer toward the hazard involved is a relevant factor). The confidential information possessed by the accused, such as his knowledge of Archbishop Levada's rejection of his legal advice to train priests on this topic, easily

could have led the accused to find evidence of the Archbishop's attitude, including testimony of others who knew of that attitude. Such evidence would have bolstered the case for punitive damages in the Brown litigation. The confidential information thus was likely to be relevant in the Brown case and was likely to injure the Archdiocese.

I conclude, therefore, that the second requirement of DR 5-105(C) (1989) for "significantly related" matters also is met in this case.

The accused argues that the Bar could not sustain its burden of proving that the matters were "significantly related" without presenting the testimony of the former client. Although testimony of the former client may be helpful in a case involving an information-specific, closed-file conflict, there is no requirement for any particular category of persons to testify in any particular case. This court's task, as discussed at the outset of this opinion, is only to review the whole record that was made and to make findings based on clear and convincing evidence. In the present case, the accused's own testimony, pleadings, and stipulations supplied clear and convincing evidence to support a finding of an information-specific conflict. And, the accused's recollection of a conversation with his former client is not "less satisfactory" than the former client's recollection of the same conversation would be.

In summary, the representation of the Archdiocese provided the accused with confidences, the use of which would likely inflict injury or damage on the former client in the course of the later matter. That being so, the former representation of the Archdiocese and the later representation of Brown were "significantly related" within the meaning of DR 5-105(C) (1989). The accused violated DR 5-105(C) (1989).

## SANCTION

In deciding on the appropriate sanction, this court refers for guidance to the American Bar Association Standards for Imposing Lawyer Sanctions (ABA Standards). *In re Smith*, 316 Or 55, 61, 848 P2d 612 (1993). ABA Standard 3.0 sets out the factors to consider in imposing sanctions: the

duty violated, the lawyer's mental state, the actual or potential injury caused by the misconduct, and the existence of aggravating or mitigating factors.

When he undertook to represent Brown despite having a conflict of interest, the accused violated duties owed to his former client (the Archdiocese) and to his later client (Brown).[4] *See* ABA Standard 4.3 (failure to avoid conflicts of interest).

The accused acted knowingly.[5] The accused acted with conscious awareness of the nature or attendant circumstances of his conduct, but without the conscious objective or purpose to accomplish a particular result. *See* ABA Standards at 7 (June 17, 1992) (a lawyer acts knowingly when he or she acts with that state of mind). In particular, the accused was consciously aware that he formerly represented the Archdiocese; that he later represented Brown in a matter adverse to the Archdiocese; that, in his capacity as lawyer for the Archdiocese, the accused received information about Archbishop Levada's attitude toward his advice concerning claims of clergy sexual misconduct; and that the issues in the Brown litigation made that attitude likely to be relevant in the Brown case. The accused did not, however, have the conscious objective or purpose to create a conflict of interest.

The conduct of the accused caused injury to both the former client and the later client. The accused caused delay and disruption to both clients. The potential for injury to the public and the profession also exists; when lawyers have conflicts of interest, they jeopardize the willingness of clients to disclose fully their confidences and thereby jeopardize the ability of clients to obtain the most effective legal representation possible. In addition, Brown became emotionally distraught as a result of the conflict and of the accused's disqualification from his case.

---

[4] The duty of the accused toward Brown, in the face of a conflict of interest, was to decline the representation.

[5] The terms of DR 5-105(C) (1989) did not include any particular state of mind. That is, a lawyer was held to a specified duty, which could be violated regardless of the lawyer's good faith. The lawyer's state of mind is relevant, however, in deciding on a sanction for violating DR 5-105(C) (1989).

The ABA Standards suggest that the appropriate sanction when a lawyer acts knowingly in these circumstances is suspension. *See* ABA Standard 4.32 (as pertinent here, suspension is generally appropriate when a lawyer knows of a conflict of interest and causes injury or potential injury to a client).

I next consider pertinent aggravating and mitigating factors.

As an aggravating factor, the accused had substantial experience in the practice of law. ABA Standard 9.22(i). Also, the later client, Brown, was vulnerable in view of the sensitive nature of his claims. *See* ABA Standard 9.22(h) (vulnerability of victim is an aggravating factor).

In mitigation, the accused enjoys an excellent reputation, ABA Standard 9.32(g), and has contributed to the profession. There was some delay in the disciplinary proceedings, ABA Standard 9.32(j). Significantly, the record shows that the accused undertook various inquiries, including consultation with the Bar, to determine whether his representation of Brown constituted a conflict of interest.[6] Finally, the Bar seeks only a reprimand.

In all the circumstances, I would conclude that suspension is not warranted, but that a reprimand is the appropriate sanction. Accordingly, I dissent.

Carson, C. J., and Gillette, J., join in this dissenting opinion.

---

[6] Before the Brown complaint was filed, a then-associate of the accused called a member of the Bar's staff who handled ethics matters, to discuss the situation. That associate testified:

"I very clearly remember having a conversation with her, and basically, you know, her saying as we always said, you know, it sounds like you're okay to me, depending on if that's what the facts really are and I have to rely on what you tell me. So relying on what I told her she said it sounded okay.

"\* \* \* \* \*

"She gave me an opinion based on what I was telling her that it was okay. That I was right, that I had the right framework and on my facts it was okay."

That associate also testified that, to his knowledge, the accused had not acquired confidential information regarding Archbishop Levada's "internal policies" about how to handle claims of clergy sexual abuse. My finding, stated above in the text, is to the contrary.